[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 00-12720

_____

T. C. Docket No. 15993-95

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 20, 2001
THOMAS K. KAHN
CLERK

UNITED PARCEL SERVICE OF AMERICA, INC.,

Petitioner-Appellant,

versus

COMMISSIONER OF INTERNAL REVENUE,

Respondent-Appellee.

_____

Appeal from a Decision of the United States Tax Court

_____

**(June 20, 2001)**

Before WILSON and COX, Circuit Judges, and RYSKAMP [*], District Judge.

COX, Circuit Judge:

_____

[*]     Honorable Kenneth L. Ryskamp, U.S. District Judge for the Southern District of Florida, sitting by designation.

The tax court held United Parcel Service of America, Inc. (UPS) liable for additional taxes and penalties for the tax year 1984. UPS appeals, and we reverse and remand.

## I. Background

UPS, whose main business is shipping packages, had a practice in the early 1980s of reimbursing customers for lost or damaged parcels up to $100 in declared value.[1] Above that level, UPS would assume liability up to the parcel's declared value if the customer paid 25¢ per additional $100 in declared value, the "excess-value charge." If a parcel were lost or damaged, UPS would process and pay the resulting claim. UPS turned a large profit on excess-value charges because it never came close to paying as much in claims as it collected in charges, in part because of efforts it made to safeguard and track excess-value shipments. This profit was taxed; UPS declared its revenue from excess-value charges as income on its 1983 return, and it deducted as expenses the claims paid on damaged or lost excess-value parcels.

UPS's insurance broker suggested that UPS could avoid paying taxes on the lucrative excess-value business if it restructured the program as insurance provided by an overseas affiliate. UPS implemented this plan in 1983 by first forming and

---

[1] These facts synopsize the high points of the tax court's long opinion, which is published at 78 T.C.M. (CCH) 262.

capitalizing a Bermuda subsidiary, Overseas Partners, Ltd. (OPL), almost all of whose shares were distributed as a taxable dividend to UPS shareholders (most of whom were employees; UPS stock was not publicly traded). UPS then purchased an insurance policy, for the benefit of UPS customers, from National Union Fire Insurance Company. By this policy, National Union assumed the risk of damage to or loss of excess-value shipments. The premiums for the policy were the excess-value charges that UPS collected. UPS, not National Union, was responsible for administering claims brought under the policy. National Union in turn entered a reinsurance treaty with OPL. Under the treaty, OPL assumed risk commensurate with National Union's, in exchange for premiums that equal the excess-value payments National Union got from UPS, less commissions, fees, and excise taxes.

Under this plan, UPS thus continued to collect 25¢ per $100 of excess value from its customers, process and pay claims, and take special measures to safeguard valuable packages. But UPS now remitted monthly the excess-value payments, less claims paid, to National Union as premiums on the policy. National Union then collected its commission, excise taxes, and fees from the charges before sending the rest on to OPL as payments under the reinsurance contract. UPS reported neither revenue from excess-value charges nor claim expenses on its 1984 return, although it did deduct the fees and commissions that National Union charged.

The IRS determined a deficiency in the amount of the excess-value charges collected in 1984, concluding that the excess-value payment remitted ultimately to OPL had to be treated as gross income to UPS. UPS petitioned for a redetermination. Following a hearing, the tax court agreed with the IRS.

It is not perfectly clear on what judicial doctrine the holding rests. The court started its analysis by expounding on the assignment-of-income doctrine, a source rule that ensures that income is attributed to the person who earned it regardless of efforts to deflect it elsewhere. *See United States v. Basye*, 410 U.S. 441, 450, 93 S. Ct. 1080, 1086 (1973). The court did not, however, discuss at all the touchstone of an ineffective assignment of income, which would be UPS's control over the excess-value charges once UPS had turned them over as premiums to National Union. *See Comm'r v. Sunnen*, 333 U.S. 591, 604, 68 S. Ct. 715, 722 (1948). The court's analysis proceeded rather under the substantive-sham or economic-substance doctrines, the assignment-of-income doctrine's kissing cousins. *See United States v. Krall*, 835 F.2d 711, 714 (8th Cir. 1987) (treating the assignment-of-income doctrine as a subtheory of the sham-transaction doctrine). The conclusion was that UPS's redesign of its excess-value business warranted no respect. Three core reasons support this result, according to the court: the plan had no defensible business purpose, as the business realities were identical before and after; the premiums paid for the National Union

4

policy were well above industry norms; and contemporary memoranda and documents show that UPS's sole motivation was tax avoidance. The revenue from the excess-value program was thus properly deemed to be income to UPS rather than to OPL or National Union. The court also imposed penalties.

UPS now appeals, attacking the tax court's economic-substance analysis and its imposition of penalties. The refrain of UPS's lead argument is that the excess-value plan had economic substance, and thus was not a sham, because it comprised genuine exchanges of reciprocal obligations among real, independent entities. The IRS answers with a before-and-after analysis, pointing out that whatever the reality and enforceability of the contracts that composed the excess-value plan, UPS's postplan practice equated to its preplan, in that it collected excess-value charges, administered claims, and generated substantial profits. The issue presented to this court, therefore, is whether the excess-value plan had the kind of economic substance that removes it from "shamhood," even if the business continued as it had before. The question of the effect of a transaction on tax liability, to the extent it does not concern the accuracy of the tax court's fact-finding, is subject to de novo review. *Kirchman v. Comm'r*, 862 F.2d 1486, 1490 (11th Cir. 1989); *see Karr v. Comm'r*, 924 F.2d 1018, 1023 (11th Cir. 1991). We agree with UPS that this was not a sham transaction, and we therefore do not reach UPS's challenges to the tax penalties.

5

## II. Discussion

I.R.C. §§ 11, 61, and 63 together provide the Code's foundation by identifying income as the basis of taxation. Even apart from the narrower assignment-of-income doctrine — which we do not address here — these sections come with the gloss, analogous to that on other Code sections, that economic substance determines what is income to a taxpayer and what is not. *See Caruth Corp. v. United States*, 865 F.2d 644, 650 (5th Cir. 1989) (addressing, but rejecting on the case's facts, the argument that the donation of an income source to charity was a sham, and that the income should be reattributed to the donor); *United States v. Buttorff*, 761 F.2d 1056, 1061 (5th Cir. 1985) (conveying income to a trust controlled by the income's earner has no tax consequence because the assignment is insubstantial); *Zmuda v. Comm'r*, 731 F.2d 1417, 1421 (9th Cir. 1984) (similar). This economic-substance doctrine, also called the sham-transaction doctrine, provides that a transaction ceases to merit tax respect when it has no "economic effects other than the creation of tax benefits." *Kirchman*, 862 F.2d at 1492.[2] Even if the transaction has economic effects, it must be disregarded if it has no business purpose and its motive is tax avoidance. *See Karr*,

---

[2] *Kirchman*, which is binding in this circuit, differs in this respect from the oft-used statement of the doctrine derived from *Rice's Toyota World, Inc. v. Comm'r*, 752 F.2d 89, 91-92 (4th Cir. 1985). *Rice's Toyota World*, unlike *Kirchman*, requires a tax-avoidance purpose as well as a lack of substance; *Kirchman* explicitly refuses to examine subjective intent if the transaction lacks economic effects.

924 F.2d at 1023 (noting that subjective intent is not irrelevant, despite *Kirchman*'s statement of the doctrine); *Neely v. United States*, 775 F.2d 1092, 1094 (9th Cir. 1985); *see also Frank Lyon Co. v. United States*, 435 U.S. 561, 583-84, 98 S. Ct. 1291, 1303 (1978) (one reason requiring treatment of transaction as genuine was that it was "compelled or encouraged by business or regulatory realities"); *Gregory v. Helvering*, 293 U.S. 465, 469, 55 S. Ct. 266, 267 (1935) (reorganization disregarded in part because it had "no business or corporate purpose").

The kind of "economic effects" required to entitle a transaction to respect in taxation include the creation of genuine obligations enforceable by an unrelated party. *See Frank Lyon Co.*, 435 U.S. at 582-83, 98 S. Ct. at 1303 (refusing to deem a sale-leaseback a sham in part because the lessor had accepted a real, enforceable debt to an unrelated bank as part of the deal). The restructuring of UPS's excess-value business generated just such obligations. There was a real insurance policy between UPS and National Union that gave National Union the right to receive the excess-value charges that UPS collected. And even if the odds of losing money on the policy were slim, National Union had assumed liability for the losses of UPS's excess-value shippers, again a genuine obligation. A history of not losing money on a policy is no guarantee of such a future. Insurance companies indeed do not make a habit of issuing policies whose premiums do not exceed the claims anticipated, but that fact

7

does not imply that insurance companies do not bear risk. Nor did the reinsurance treaty with OPL, while certainly reducing the odds of loss, completely foreclose the risk of loss because reinsurance treaties, like all agreements, are susceptible to default.

The tax court dismissed these obligations because National Union, given the reinsurance treaty, was no more than a "front" in what was a transfer of revenue from UPS to OPL. As we have said, that conclusion ignores the real risk that National Union assumed. But even if we overlook the reality of the risk and treat National Union as a conduit for transmission of the excess-value payments from UPS to OPL, there remains the fact that OPL is an independently taxable entity that is not under UPS's control. UPS really did lose the stream of income it had earlier reaped from excess-value charges. UPS genuinely could not apply that money to any use other than paying a premium to National Union; the money could not be used for other purposes, such as capital improvement, salaries, dividends, or investment. These circumstances distinguish UPS's case from the paradigmatic sham transfers of income, in which the taxpayer retains the benefits of the income it has ostensibly forgone. *See, e.g.*, *Zmuda v. Comm'r*, 731 F.2d at 1417 (income "laundered" through a series of trusts into notes that were delivered to the taxpayer as "gifts"). Here that benefit ended up with OPL. There were, therefore, real economic effects from this transaction on all of its parties.

The conclusion that UPS's excess-value plan had real economic effects means, under this circuit's rule in *Kirchman*, that it is not per se a sham. But it could still be one if tax avoidance displaced any business purpose. The tax court saw no business purpose here because the excess-value business continued to operate after its reconfiguration much as before. This lack of change in how the business operated at the retail level, according to the court, betrayed the restructuring as pointless.

It may be true that there was little change over time in how the excess-value program appeared to customers. But the tax court's narrow notion of "business purpose" — which is admittedly implied by the phrase's plain language — stretches the economic-substance doctrine farther than it has been stretched. A "business purpose" does not mean a reason for a transaction that is free of tax considerations. Rather, a transaction has a "business purpose," when we are talking about a going concern like UPS, as long as it figures in a bona fide, profit-seeking business. *See ACM P'ship v. Comm'r*, 157 F.3d 231, 251 (3d Cir. 1998). This concept of "business purpose" is a necessary corollary to the venerable axiom that tax-planning is permissible. *See Gregory v. Helvering*, 293 U.S. 465, 469, 55 S. Ct. 266, 267 (1935) ("The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted."). The Code treats lots of categories of economically similar behavior

9

differently. For instance, two ways to infuse capital into a corporation, borrowing and sale of equity, have different tax consequences; interest is usually deductible and distributions to equityholders are not. There may be no tax-independent reason for a taxpayer to choose between these different ways of financing the business, but it does not mean that the taxpayer lacks a "business purpose." To conclude otherwise would prohibit tax-planning.

The caselaw, too, bears out this broader notion of "business purpose." Many of the cases where no business purpose appears are about individual income tax returns, when the individual meant to evade taxes on income probably destined for personal consumption; obviously, it is difficult in such a case to articulate any *business* purpose to the transaction. *See, e.g.*, *Gregory*, 293 U.S. at 469, 55 S. Ct. at 267 (purported corporate reorganization was disguised dividend distribution to shareholder); *Knetsch v. United States*, 364 U.S. 361, 362-65, 81 S. Ct. 132, 133-35 (1960) (faux personal loans intended to generate interest deductions); *Neely v. United States*, 775 F.2d 1092, 1094 (9th Cir. 1985) (one of many cases in which the taxpayers formed a trust, controlled by them, and diverted personal earnings to it). Other no-business-purpose cases concern tax-shelter transactions or investments by a business or investor that would not have occurred, *in any form*, but for tax-avoidance reasons. *See, e.g.*, *ACM P'ship*, 157 F.3d at 233-43 (sophisticated investment partnership

10

formed and manipulated solely to generate a capital loss to shelter some of Colgate-Palmolive's capital gains); *Kirchman*, 862 F.2d at 1488-89 (option straddles entered to produce deductions with little risk of real loss); *Karr*, 924 F.2d at 1021 (façade of energy enterprise developed solely to produce deductible losses for investors); *Rice's Toyota World, Inc. v. Comm'r,*, 752 F.2d 89, 91 (4th Cir. 1985) (sale-leaseback of a computer by a car dealership, solely to generate depreciation deductions). By contrast, the few cases that accept a transaction as genuine involve a bona fide business that — perhaps even by design — generates tax benefits. *See, e.g.*, *Frank Lyon*, 435 U.S. at 582-84, 98 S. Ct. at 1302-04 (sale-leaseback was part of genuine financing transaction, heavily influenced by banking regulation, to permit debtor bank to outdo its competitor in impressive office space); *Jacobson v. Comm'r*, 915 F.2d 832, 837-39 (2d Cir. 1990) (one of many cases finding that a bona fide profit motive provided a business purpose for a losing investment because the investment was not an obvious loser ex ante).

The transaction under challenge here simply altered the form of an existing, bona fide business, and this case therefore falls in with those that find an adequate business purpose to neutralize any tax-avoidance motive. True, UPS's restructuring was more sophisticated and complex than the usual tax-influenced form-of-business election or a choice of debt over equity financing. But its sophistication does not

11

change the fact that there was a real business that served the genuine need for customers to enjoy loss coverage and for UPS to lower its liability exposure.

We therefore conclude that UPS's restructuring of its excess-value business had both real economic effects and a business purpose, and it therefore under our precedent had sufficient economic substance to merit respect in taxation. It follows that the tax court improperly imposed penalties and enhanced interest on UPS for engaging in a sham transaction. The tax court did not, however, reach the IRS's alternative arguments in support of its determination of deficiency, the reallocation provisions of I.R.C. §§ 482 and 845(a). The holding here does not dispose of those arguments, and we therefore must remand for the tax court to address them in the first instance.

## III. Conclusion

For the foregoing reasons, we reverse the judgment against UPS and remand the action to the tax court for it to address in the first instance the IRS's contentions under §§ 482 and 845(a).

REVERSED AND REMANDED.

RYSKAMP, District Judge, dissenting:

I respectfully dissent. Although I agree with the majority's recitation of the facts as well as its interpretation of the applicable legal standard, I find that its reversal of the tax court is contrary to the great weight of the evidence that was before the lower court. The majority, as well as the tax court below, correctly finds that the question before the Court is whether UPS's insurance arrangements with NUF and OPL are valid under the sham-transaction doctrine. Under the sham-transaction doctrine, UPS's transaction ceases to merit tax respect when it has no "economic effects other than the creation of tax benefits," *Kirchman v. Comm'r*, 862 F.2d 1486, 1492 (11th Cir. 1991), or has no business purpose and its sole motive is tax avoidance. *See Karr v. Comm'r*, 924 F.2d 1018, 1023 (11th Cir. 1991). Thus the question before the Court is not strictly whether UPS had a tax avoidance motive when it formulated the scheme in question, but rather whether there was some legitimate, substantive business reason for the transaction as well. There clearly was not.

As the tax court articulated in great detail in its well-reasoned 114-page opinion, the evidence in this case overwhelmingly demonstrates that UPS's reinsurance arrangement with NUF and OPL had no economic significance or business purpose outside of UPS's desire to avoid federal income tax, and was therefore a sham transaction. First, the tax court based its decision upon evidence that

13

the scheme in question was subjectively motivated by tax avoidance. For example, the evidence showed that tax avoidance was the initial and sole reason for the scheme in question, that UPS held off on the plan for some time to analyze tax legislation on the floor of the United States House of Representatives, and that a letter sent to AIG Insurance from UPS detailing the scheme claimed that AIG would serve in merely a "fronting" capacity and would bear little or no actual risk. The evidence thus showed that this scheme was hatched with only tax avoidance in mind.

Second, the tax court based its decision on overwhelming evidence that UPS's scheme had no real economic or business purpose outside of tax avoidance. For example, the evidence showed that NUF's exposure to loss under the plan (except in the very unlikely event of *extreme* catastrophe) was infinitesimal, and that UPS nevertheless continued to fully bear the administrative costs of the EVC program. NUF was only liable for losses not covered by another insurance policy held by UPS , yet UPS still collected the EVC's and deposited the money into UPS bank accounts, still processed EVC claims, and continued to pay all EVC claims out of UPS bank accounts (while collecting the accrued interest for itself). All NUF really did in the scheme was collect over $1 million in fees and expenses before passing the EVC income on to OPL, which was of course wholly owned by UPS shareholders. In

14

essence, NUF received an enormous fee from UPS in exchange for nothing.

Moreover, the tax court systematically rejected every explanation of the scheme put forth by UPS. UPS claimed that the scheme was meant to avoid violation of state insurance laws, yet the evidence showed no real concern for such laws and that in fact UPS was well aware that federal preemption of these state laws likely made its old EVC plan legal. UPS claimed that it intended OPL to become a full-line insurer someday, yet the evidence showed that it was nevertheless unnecessary to specifically use *EVC income* for such a capital investment. UPS claimed that elimination of the EVC income allowed it to increase its rates, yet one of its own board members testified that this explanation was untrue. I also note that UPS's claim that OPL was a legitimate insurance company fails in light of the fact that OPL was charging a substantially inflated rate for EVCs. Evidence in the tax court showed that in an arms-length transaction with a legitimate insurance company, EVC rates would have been approximately half those charged by UPS (and in turn passed on to OPL), providing further evidence that the transaction was a sham. In sum, UPS failed to show any legitimate business reason for giving up nearly $100 million in EVC income in 1984.

For these reasons, I would affirm the holding of the tax court and find that

UPS's arrangement with NUF and OPL was a sham transaction subject to federal tax liability.