117 T.C. No. 27


UNITED STATES TAX COURT


NICOLE ROSE CORP., FORMERLY QUINTRON CORPORATION, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 3328-00.            Filed December 28, 2001.


        <u>Held</u>:  Approximately $22 million in claimed
ordinary business expense deductions are disallowed
because they relate to transactions lacking in business
purpose and in economic substance.


        <u>Stanley C. Ruchelman</u>, <u>Harold L. Adrion</u>, and <u>Sandra Gale</u>
<u>Behrle</u>, for petitioner.

        <u>Lewis R. Mandel</u> and <u>Andrew J. Mandell</u>, for respondent.

SWIFT, Judge:  For petitioner's taxable years ending
January 31, 1992, 1993, and 1994, respondent determined
deficiencies in petitioner's Federal income taxes and accuracy-
related penalties as follows:

|      |            | Accuracy-Related Penalty |
|------|------------|--------------------------|
| Year | Deficiency | Sec. 6662(a)             |
| 1992 | $1,171,365 | $234,273                 |
| 1993 | 684,700    | 136,940                  |
| 1994 | 4,559,237  | 911,847                  |

Unless otherwise indicated, all section references are to
the Internal Revenue Code in effect for the years in issue, and
all Rule references are to the Tax Court Rules of Practice and
Procedure.

The primary issue for decision is whether the transfer of
petitioner's interests in multilayered leases of computer
equipment and related trusts had business purpose and economic
substance and should be recognized for Federal income tax
purposes and whether petitioner should be entitled to the
$22 million in claimed ordinary business expense deductions
relating thereto.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

At the time the petition was filed, petitioner's principal
place of business was located in Jericho, New York.

In 1992, Quintron Corp. (Quintron), a Virginia corporation, entered into negotiations with Loral Aerospace Corp. (Loral), a Delaware corporation, for the sale to Loral of Quintron stock or for the sale to Loral of Quintron's assets.

Quintron was engaged in the design, manufacture, sale, and service of aircraft flight simulators and other electronic equipment.  Loral was a major defense contractor and was engaged in the design, manufacture, sale, and service of communications and satellite equipment.

Representatives of Quintron wanted Loral to purchase from Quintron's shareholders their stock in Quintron.  Representatives of Loral wanted Loral to purchase the assets of Quintron.

In 1993, representatives of Intercontinental Pacific Group, Inc. (IPG), a California corporation and the parent corporation of QTN Acquisition, Inc. (QTN), suggested that, with IPG's and QTN's participation as a type of intermediary or facilitator in the transaction, the stock in Quintron could be sold, and Loral could purchase Quintron's assets.  The controlling shareholder of IPG was Douglas Wolf (Wolf).[1]

After further negotiations, in September of 1993, QTN, until that point in time a dormant shell corporation and a subsidiary of IPG, purchased from the shareholders of Quintron for $23,369,125 in cash their stock in Quintron.  QTN financed this stock purchase through a bank loan.

---

[1]    Wolf was a lawyer and organized IPG to purchase and sell leased equipment.

Upon purchase of the stock in Quintron, QTN was merged into Quintron, and Quintron thereafter remained as the surviving corporation and was controlled by IPG.[2]  A major benefit to IPG and to QTN of retaining Quintron as the surviving corporation after the merger between Quintron and QTN was that Quintron had significant taxable income in 1993 and prior years against which claimed carryback losses (arising from the claimed ordinary deductions relating to the transactions at issue herein) could be applied in an attempt to produce large tax refunds for the successor corporation to Quintron (and even though, as stated, QTN in prior years had been a dormant shell corporation).

By prearrangement and simultaneously with the above stock purchase transaction, Quintron (the stock of which was now controlled by IPG) sold to Loral the assets of Quintron.[3] Quintron's sale price for the assets was approximately $20.5 million in cash, plus the assumption by Loral of certain liabilities of Quintron.  Expenses of $892,943 were incurred by QTN and Quintron in connection with the stock purchase and asset sale transactions.

In spite of the transactions involving the purchase of its stock by QTN, QTN's merger with Quintron, and the sale of assets

---

[2]    After the merger of QTN into Quintron, IPG owned directly or indirectly more than 75 percent of the stock in Quintron.

[3]    The parties do not explain why the only assets of Quintron that were sold to Loral consisted of $4.6 million in goodwill, $16.5 million in trade receivables, and $85,000 in other assets. Presumably, Quintron had operating assets that were the basis of Quintron's manufacturing and sales business.  What happened to such operating assets is not explained in the record.

to Loral, and in spite of Quintron's name change on October 27, 1993, to "Nicole Rose Corp.", for convenience generally hereinafter we refer to Quintron as "petitioner".

The $20.5 million received on the sale of assets to Loral was used by petitioner to pay off most of the bank loan obtained to purchase the stock in Quintron.

Upon the sale of assets to Loral (due to petitioner's low carryover tax bases in the assets) petitioner would be required to recognize on its 1994 Federal income tax return approximately $11 million in income.[4]

The above $11 million in income that petitioner would have to report on its 1994 Federal income tax return (relating to petitioner's sale of assets) explains the transactions that were entered into in order to produce the claimed $22 million in ordinary Federal income tax deductions that are at issue herein. Petitioner, QTN, IPG, other entities controlled by Wolf, and other domestic and foreign entities, planned and participated in a series of complicated, tax-oriented transactions involving the establishment and transfer of petitioner's interests in certain leases of computer equipment and related trusts.

We first explain the background and history relating to the leased equipment. We then seek to explain the complicated tax-oriented maneuvers that petitioner and others entered into in

---

[4] Because the stock in Quintron was purchased by QTN, followed by QTN's merger into Quintron, Quintron's tax bases in the assets were not, prior to the sale to Loral, adjusted to fair market value.

order to produce the claimed $22 million tax deductions relating thereto.

Background Relating to Leases[5]

In 1990, N.V. Brussels Airport Terminal Co. (Brussels Airport), a Belgium corporation which financed, developed, and managed the Brussels, Belgium, airport, purchased from ABN AMRO Bank, N.V. (ABN), a commercial Dutch bank, certain computer equipment and leased the equipment back to ABN, which was the end user of the equipment. Brussels Airport financed the purchase of

---

[5] Also in 1990 and later years, in addition to the series of computer equipment leasing transactions, transfers, and payments into trust (relating to what we refer to generally as the Brussels Airport package of leased equipment) that are specifically described in our findings of fact, two other series of transactions were entered into involving petitioner, entities controlled by IPG, other domestic entities, and two foreign entities (namely, N.V. Reilly Chemicals S.A. (Reilly) and Reibelco S.A. (Reibelco)), that also involved computer equipment leasing transactions, transfers, and payments into trusts, and that generated large ordinary tax deductions claimed by petitioner, that were disallowed by respondent, and that are at issue herein.

At the time of trial, however, none of the documentation relating to the Reilly and to the Reibelco transactions could be located by petitioner. Because the nature and purpose of the Reilly and Reibelco transactions (for which no documentation is available) are, in all relevant respects, similar to the transactions involving the Brussels Airport leased equipment described in our findings of fact (for which documentation is available), petitioner and respondent have stipulated that the resolution of the claimed tax deductions in issue relating to the Brussels Airport leased equipment will also control the resolution of the tax issues relating to the Reilly and Reibelco transactions. In order properly to reflect the amounts involved that are the basis for petitioner's claimed $22 million tax deductions, in our findings and opinion we generally use dollar amounts that reflect cumulative numbers and cumulative dollar amounts for the three series of transactions (i.e., our findings and opinion generally reflect cumulative dollar amounts for the combined Brussels Airport, Reilly, and Reibelco transactions).

the equipment with a loan from Pierson, Heldring & Pierson N.V. (Pierson), a subsidiary of ABN (Pierson loan).

The initial term of the leaseback of the equipment from Brussels Airport to ABN (the Brussels Leaseback) extended from December 28, 1990, to December 31, 1997.  Under the Brussels Leaseback, ABN had the option to extend the Brussels Leaseback for up to 3 additional years.

Because of similarities in the amounts due under the Brussels Leaseback and the Pierson loan, ABN was to make lease payments due under the Brussels Leaseback directly to Pierson, and the lease payments were then to be applied by Pierson in satisfaction of the payments due on the Pierson loan.

One year later, on December 12, 1991, ABN assigned to Atrium Finis (Atrium), an equipment leasing and financing partnership organized under the laws of the United Kingdom, all of its interest as lessee under the remaining 6-year term of the 7-year Brussels Leaseback.  ABN, however, simultaneously leased back from Atrium for approximately 3 years, until December 31, 1994, use of the equipment covered by the Brussels Leaseback, and ABN retained an option to extend this leaseback for an additional 4 years, until December 31, 1998 (the Atrium Sublease).

On December 12, 1991, ABN prepaid to Atrium approximately $25 million, reflecting generally lease payments scheduled to be paid to Atrium by ABN over the course of the 3-year Atrium

Sublease. This $25 million (taking into account the time value of money) apparently corresponded generally to approximately 90 percent of the total lease payments to be paid during the remaining 6-year term of the Brussels Leaseback.

By prearrangement, with receipt from ABN of the $25 million in prepaid lease payments, the $25 million was transferred into a trust fund (the Trust Fund) to secure Pierson's right to receive the lease payments due under the remaining 6-year term of the Brussels Leaseback.

Under the December 12, 1991, assignment to Atrium of ABN's interest in the Brussels Leaseback, even though Pierson was secured for the lease payments due from Atrium under the Brussels Leaseback, Atrium was stated to be nominally obligated on the lease payments due thereunder (which as stated were to be paid directly to Pierson as lender). Pierson, however, had no recourse to Atrium on the Pierson loan. Pierson's recourse thereon was limited to the equipment covered by the Brussels Leaseback and to the $25 million that was transferred into the Trust Fund.

As creditor on Brussels Airport's purchase of the equipment from ABN and as the entity to whom the ABN end-user lease payments ultimately were due to be paid under the Brussels Leaseback, the beneficiary of the Trust Fund was Pierson. Even though Pierson, however, was the beneficiary of the Trust Fund

and was to receive distributions from the $25 million Trust Fund over the course of the remaining term of the Brussels Leaseback, Pierson also was the trustee of the Trust Fund, and, as such, from the December 12, 1991, date on which the funds were transferred into the Trust Fund, Pierson had possession of the $25 million.

Under the terms of the Trust Fund, in 1995, 1996, and 1997 Atrium was required to make additional payments into the Trust Fund of approximately $1.6 million relating to the remaining 10 percent of the total payments to be paid during the remaining 6-year term of the Brussels Leaseback.

Residual Value Certificate, Transfer of Interest in the
Trust Fund, and Cancellation of Petitioner's Lease Interest

From March of 1993 through September of 1993, ABN, Atrium, Wolf on behalf of QTN and petitioner, and other parties negotiated a modification or a restructuring to some of the terms relating to the payments due under the Brussels Leaseback, under the Atrium Sublease, and under the Trust Fund. The additional $1.6 million that Atrium, in later years, would have been required to pay under the Trust Fund was reduced to $400,000. ABN effectively obligated itself to continue leasing the equipment during the 4-year renewal period of the Atrium Sublease, and the scheduled lease payments to be due from ABN during the 4-year period were restructured.

As restructured as of September 30, 1993, the lease payments to be paid to Atrium during the 4-year renewal period were set forth and described in what was referred to as a residual value certificate (RVC). Under the terms of the RVC, ABN would be required to pay Atrium, on November 30, 1996, and on November 30, 1998, an unspecified amount equal to 200 percent of the fair market value of the leased equipment, as of the two respective payment due dates, in excess of specified base amounts of $5 million on the first date and $2 million on the second date. In other words, if the fair market value of the leased equipment as of the specified dates did not exceed the stated base amounts for the equipment, no payments would be due from ABN under the RVC. Also, under the terms of the RVC, ABN expressly disclaimed any warranty or representation regarding the present or future value of the equipment.

In connection with ABN's, Atrium's, and ultimately petitioner's participation and acceptance of the terms of the RVC, no appraisal was obtained of the fair market value of the leased equipment as of September 30, 1993, and ABN, Atrium, and petitioner relied on an incomplete and outdated appraisal of the leased equipment made in 1991. No credible effort was made to establish, as of September of 1993, that the base amounts specified in the RVC were reasonable and that the RVC had any foreseeable value.

On September 30, 1993 (through a series of section 351 transfers involving a number of entities related to and controlled generally by Wolf and through which Atrium ultimately received stock in a corporation related to petitioner),[6] Atrium transferred to petitioner Atrium's remaining interests and obligations relating to the underlying Brussels Leaseback, the Atrium Sublease, and the Trust Fund. The interests transferred to petitioner included the potential right to receive the unspecified payments from ABN under the RVC and the stated obligation to make the restructured additional $400,000 payment into the Trust Fund. This transfer to petitioner was the first, direct step in the plan to generate the multi-million dollar ordinary tax deductions that petitioner sought to use as an offset against, among other income, the $11 million that petitioner would be required to recognize on its 1994 U.S. Corporation Income Tax Return (Form 1120) as a result of the sale to Loral of Quintron's assets.

As the second, direct, prearranged step in the plan to generate for petitioner the above-referenced multi-million dollar tax deduction, also on September 30, 1993, simultaneously with petitioner's receipt from Atrium of the above interests relating

---

[6]    For convenience, we do not specifically identify each and every entity related to and generally controlled by Wolf which participated in the various transactions involving the transfer of the leases and the interest in the Trust Fund.

to the Brussels Leaseback, the Atrium Sublease, and the Trust Fund, petitioner transferred to B.V. Handelsmaatschappij Wildervank (Wildervank), a Dutch bank based in the Netherlands, petitioner's interests in the Brussels Leaseback and in the Trust Fund, $400,000 in cash, and 10 shares of stock in Cove Enterprises, Inc. (Cove), an unrelated corporation. Petitioner's interest in the RVC was not transferred to Wildervank and was retained by petitioner.

In exchange for the above transfers to Wildervank, Wildervank assumed all of petitioner's purported lease obligations relating to the Brussels Leaseback and the Trust Fund.

On September 30, 1993, the balance of the funds held in trust by the Trust Fund was approximately $22 million.

On or about November 30, 1996, ABN informed petitioner that no payment would be made to petitioner under the RVC. Petitioner made no effort to establish the value of the leased equipment or otherwise to question why no payment would be made to it under the RVC. On October 1, 1997, petitioner was liquidated and went out of business.

On its 1994 Federal corporation income tax return (reflecting a taxable year ending January 31, 1994), petitioner reported income in the amount of approximately $11 million relating to the sale of assets to Loral, and petitioner claimed

an ordinary business expense deduction of $400,000 relating to the transfer to Wildervank of $400,000 in cash, a capital loss of $2,118,644 relating to the transfer to Wildervank of the 10 shares of Cove common stock, and an ordinary business expense deduction of $21,840,660 relating to the transfer to Wildervank of its interests in the Brussels Leaseback and in the Trust Fund.[7]

Petitioner's approximate $22 million claimed ordinary business expense deductions offset the $11 million in income that petitioner was required to report on the sale of assets to Loral and also resulted in petitioner's reporting for 1994 a claimed net operating loss of $8,953,708. Petitioner elected to carry back from 1994 to 1992 and to 1993 the $8,953,708 claimed net operating loss to offset Quintron's reported income for those years, and based thereon respondent issued refunds to petitioner for 1992 and 1993 in the respective amounts of $1,172,448 and $684,705.

In respondent's notice of deficiency to petitioner for 1992, 1993, and 1994, respondent disallowed petitioner's claimed $400,000 and $21,840,660 ordinary business expense deductions relating to the above transactions petitioner claimed on its 1994

---

[7]  Petitioner's tax return preparer, Howard B. Teig, C.P.A., received $39,940 for his involvement in the above transactions and for his preparation of petitioner's 1994 Federal income tax return.

Federal income tax return, and respondent disallowed petitioner's $8,953,708 claimed net operating loss carryback deduction to 1992 and to 1993. Respondent did not disallow the $2,118,644 claimed capital loss relating to petitioner's transfer to Wildervank of the Cove common stock.

## OPINION

Taxpayers have a legal right to structure transactions to minimize their tax obligations. Gregory v. Helvering, 293 U.S. 465, 469 (1935). A transaction, however, entered into solely for tax avoidance without economic, commercial, or legal effect other than expected tax benefits constitutes an economic sham without effect for Federal income tax purposes. Frank Lyon Co. v. United States, 435 U.S. 561, 573 (1978); Gilman v. Commissioner, 933 F.2d 143, 147-148 (2d Cir. 1991), affg. T.C. Memo. 1990-205; Rice's Toyota World, Inc. v. Commissioner, 81 T.C. 184, 196 (1983), affd. in part and revd. in part 752 F.2d 89 (4th Cir. 1985).

Whether we respect a taxpayer's characterization of a transaction depends upon whether the characterization represents and is supported by a bona fide transaction with economic substance, compelled or encouraged by business or regulatory realities, and not shaped solely or primarily by tax avoidance features that have meaningless labels attached. Frank Lyon Co.

v. United States, supra at 583-584; Winn-Dixie Stores, Inc. v.
Commissioner, 254 F.3d 1313, 1316 (11th Cir. 2001), affg. 113
T.C. 254 (1999); UPS of Am., Inc. v. Commissioner, 254 F.3d 1014,
1018-1020 (11th Cir. 2001), revg. T.C. Memo. 1999-268; ACM Pship.
v. Commissioner, 157 F.3d 231, 247 (3d Cir. 1998), affg. in part,
revg. in part, dismissing in part, and remanding T.C. Memo. 1997-
115.

Our inquiry as to whether a transaction has sufficient
economic substance to be recognized for Federal income tax
purposes turns on the subjective business purpose and on the
objective economic substance of the transaction. Kirchman v.
Commissioner, 862 F.2d 1486, 1490-1492 (11th Cir. 1989), affg.
Glass v. Commissioner, 87 T.C. 1087 (1986).

In UPS of Am., Inc. v. Commissioner, T.C. Memo. 1999-268, we
held that the restructure of certain insurance premiums lacked
business purpose and economic substance and should be disregarded
for Federal income tax purposes. On appeal, the Court of Appeals
for the Eleventh Circuit reversed. UPS of Am., Inc. v.
Commissioner, 254 F.3d 1014 (11th Cir. 2001). In the context of
an ongoing, viable business, the Court of Appeals articulated
"business purpose" broadly, as follows:

> a transaction has a "business purpose," when we are
> talking about a going concern like UPS, as long as it
> figures in a bona fide, profit-seeking business. * * *
> [Id. at 1019.]

Under any version of the business purpose and economic substance test, the transactions before us must be regarded as lacking in business purpose and economic substance. Additionally, we note that, prior to the September 1993 transactions, QTN was a dormant shell corporation, controlled by Wolf, not a going concern.

Petitioner contends that it is entitled to the $22 million claimed ordinary business expense deductions relating to its transfer to Wildervank of its interest in the Trust Fund and the $400,000 in cash. Petitioner's apparent theory of deductibility is that the value of petitioner's interest in the Trust Fund was equal to the $21.8 million balance in the Trust Fund and therefore that when petitioner transferred to Wildervank its interest in the Trust Fund, plus the $400,000 in cash, the transfer should be treated as a "payment" by petitioner to Wildervank of $22 million in exchange for the cancellation of petitioner's obligation on an onerous lease. In support, petitioner cites case authority and respondent's rulings for the proposition that payments extinguishing lease obligations may qualify as ordinary and necessary business expense deductions. Hort v. Commissioner, 313 U.S. 28, 32 (1941); Stuart Co. v. Commissioner, 195 F.2d 176, 177 (9th Cir. 1952), affg. a Memorandum Opinion of this Court; Helvering v. Cmty. Bond & Mortgage Corp., 74 F.2d 727, 728 (2d Cir. 1935), affg. 27 B.T.A.

480 (1932); Rev. Rul. 69-511, 1969-2 C.B. 23; Rev. Rul. 68-112, 1968-1 C.B. 62.

Petitioner claims that the RVC it received and retained had significant value, that petitioner had the opportunity to realize significant profit from the RVC, and that this profit potential explains and supports petitioner's participation in a legitimate for-profit transaction.

Respondent claims that the transfer to Wildervank of petitioner's interests in the Brussels Leaseback, in the Trust Fund, and in the $400,000 in cash, in exchange for Wildervank's assumption of petitioner's obligations relating to the Brussels Leaseback and the Trust Fund lacked business purpose and economic substance and should be disregarded. We agree with respondent.

The record establishes that no credible business purpose and that no viable economic substance existed for the transfer to Wildervank of petitioner's interests in the Brussels Leaseback, in the Trust Fund, and in the $400,000 in cash. The complicated nature of these transactions fails to mask the lack of business purpose and economic substance in key aspects of the transactions and the tax avoidance objectives thereof.

In September of 1993, when it participated in these transactions, petitioner never had any genuine obligation with respect to the Brussels Leaseback and the Trust Fund. Even petitioner's payment of the $400,000 in cash we regard as not

supported by a valid business purpose and economic substance. That payment is tainted by petitioner's sole tax motivation for participating in these transactions.

Petitioner's only purpose for transferring to Wildervank its interests in the Brussels Leaseback and in the Trust Fund was to create the claimed tax deductions. As respondent's expert testified at trial, independent of the production of claimed tax deductions, there was no purpose to, and no substance for, the transfer to Wildervank of petitioner's interests in the Brussels Leaseback and in the Trust Fund.

As respondent's expert testified, the RVC had no value. In fact, due to incomplete information, a significant portion of the underlying equipment to which the RVC related was not capable of being valued.

The testimony at trial and the report of the expert who was used in late 1990 and early 1991, at the time of the original Brussels Leaseback, were significantly inadequate. The expert and his report reflect incomplete information on the type of equipment, the manufacturer of the equipment, the extent of the equipment, the model of the equipment, and the original market introduction date of the equipment. In his calculations, the expert used a beginning life for the equipment that corresponded with the 1991 Brussels Leaseback, even though the expert knew that the type of equipment involved in the leaseback had been

introduced into the market a number of years prior thereto. The expert utilized the same methodology for valuation that he used and that we specifically rejected in Smoot v. Commissioner, T.C. Memo. 1991-268.

Although we criticize petitioner's expert witness, who also was used in 1990 and 1991 in connection with the Brussels Leaseback, we do not suggest any lack of business purpose or economic substance in the Brussels Leaseback, the Atrium Sublease, or the Trust Fund, about which we have inadequate information, which involved generally non-U.S. taxpayers, and with respect to which no U.S. tax issue has been raised. Our focus, our findings, and our conclusions relate to petitioner's interest in, and the transfer of its interest in, the Trust Fund and in the value of the RVC, and whether a business purpose and economic substance were associated with petitioner's participation in these specific latter transactions.

The report and the testimony of petitioner's trial expert witness (in addition to relying on and perpetuating errors made by petitioner's first expert witness) were riddled with additional significant errors and inaccuracies. Many items of equipment were omitted from his report, and values were used for some of the equipment that was included in his report that were higher than the original cost figures for the equipment. Petitioner's experts were not credible.

Petitioner's actions, or lack thereof, corroborate that petitioner never regarded the RVC as having any value. In 1993, prior to receiving the RVC, petitioner never obtained an independent appraisal of the equipment, and in 1997, when petitioner was notified that a payment would not be made under the RVC, petitioner did nothing to establish the value of the equipment and to verify that under the RVC petitioner had no right to receive a payment from ABN.

The various transfers prior to 1993 relating to the Brussels Leaseback, the Atrium Sublease, and the Trust Fund created essentially a circular flow of funds with the net result that, once the $25 million was transferred into the Trust Fund by ABN, Pierson was obligated to pay itself. Pierson's only recourse for the payments under the Brussels Leaseback was from the equipment and from the funds held in the Trust Fund. Because the $25 million transferred into the Trust Fund represented security for Pierson as lender on the Brussels Leaseback and because of Pierson's status as trustee on and as beneficiary of the Trust Fund, petitioner had no legitimate interest of value in the Trust Fund and no legitimate obligations associated therewith.

Petitioner's claimed $22 million tax deductions relating to interests held for less than a day in the Brussels Leaseback and in the Trust Fund constitute merely a tax ploy, a sham, without business purpose and without economic substance.

Petitioner's case and ruling authority involving the tax treatment of payments to cancel legitimate and economically viable lease obligations are not applicable.

Further, from petitioner's perspective, no nontax profit potential was associated with petitioner's role as facilitator in connection with the purchase of the Quintron stock and the sale of assets to Loral. As a result thereof (due only to the low tax bases in the assets), petitioner was required to report more than $11 million in paper taxable income. Petitioner paid $23,369,125 for the stock of Quintron and then sold to Loral the assets of Quintron for $20,576,754 (retaining five accounts receivable with a balance of $2,997,364). Assuming the retained accounts receivable were fully collected by petitioner, producing a gross profit of $204,992 on the prearranged and simultaneous stock purchase and asset sale transactions, petitioner's $892,943 in expenses more than consumed any gross profit.

Petitioner's participation in the purchase of Quintron stock and in the asset sale to Loral is explained by petitioner's manufacture of the $22 million claimed tax deductions which, if allowed, would effectively offset the tax cost associated with petitioner's sale of assets and which would produce to petitioner refunds of $1,857,153 in taxes Quintron (not petitioner) had paid in prior years. Again, from petitioner's perspective, claimed

tax benefits provide the only credible explanation for petitioner's participation.

The evidence is clear that petitioner had no valid business purpose for the transfer to Wildervank of its interests in the Trust Fund and in the Brussels Leaseback and for the transfer to Wildervank of the $400,000 in cash.  Other than claimed tax benefits, petitioner received nothing of value.  The transactions lacked business purpose and economic substance, and the transactions are to be disregarded for Federal income tax purposes.

Petitioner argues that because of a shift in respondent's argument, the burden of proof should be shifted to respondent. Rule 142.  Our findings and conclusions herein are based on the evidence and are made without reliance on the burden of proof.

Other arguments made by petitioner have been considered and are without merit.

Section 6662 imposes a penalty of 20 percent on underpayments of tax attributable to negligence or to disregard of the rules or the regulations.  For purposes of section 6662(a), negligence constitutes a failure to make a reasonable attempt to comply with the Internal Revenue Code.  Sec. 6662(c).

The accuracy-related penalty under section 6662(a) will not apply to any part of petitioner's underpayments of tax if, with regard to that part of the underpayments, petitioner establishes

reasonable cause and if petitioner acted in good faith.  Sec. 6664(c).

The participation of highly paid professionals provides petitioner no protection, excuse, justification, or immunity from the penalties in issue.  Petitioner participated in a clear and obvious scheme to reap the benefits of claimed ordinary business expense deductions that had no business purpose and no economic substance.  The facts and circumstances of this case reflect no reasonable cause and no good faith for petitioner's participation in the transactions before us.

Petitioner is liable for the accuracy-related penalties under section 6662(a).

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.