T.C. Memo. 2015-113

UNITED STATES TAX COURT

SANDRA K. SHOCKLEY, TRANSFEREE, ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent[*]

Docket Nos.  28207-08, 28208-08,          Filed June 22, 2015.
             28210-08.

Jenny L. Johnson, Aharon S. Kaye, Guinevere M. Moore, Ziemowit T.

Smulkowski, and Alexander S. Vesselinovitch, for petitioners.

Lyle B. Press, Steven N. Balahtsis, and Gail Campbell, for respondent.

_____

[1]Cases of the following petitioners are consolidated herewith:  Terry K. Shockley, Transferee, docket No. 28208-08; and Shockley Holdings, Limited Partnership, Transferee, docket No. 28210-08.

[*]This opinion supplements our previously filed opinion, Shockley v. Commissioner, T.C. Memo. 2011-96, rev'd and remanded, 686 F.3d 1228 (11th Cir. 2012).

[*2] SUPPLEMENTAL MEMORANDUM FINDINGS OF FACT AND OPINION

COHEN, Judge:  These cases are before us on remand from the U.S. Court of Appeals for the Eleventh Circuit in Shockley v. Commissioner, 686 F.3d 1228 (11th Cir. 2012) (Shockley II), rev'g and remanding T.C. Memo. 2011-96 (Shockley I).  The Court of Appeals in Shockley II reversed our decisions entered in accordance with Shockley I, in which we decided the period of limitations issue in favor of petitioners.  Accordingly, these cases were remanded to this Court for further proceedings on the issues that were not reached in Shockley I.

Subsequent to the remand, the Court of Appeals for the Seventh Circuit in Feldman v. Commissioner, 779 F.3d 448 (7th Cir. 2015), aff'g T.C. Memo. 2011-297, interpreted Wisconsin law that we apply in these cases.  Although these cases are appealable to the Court of Appeals for the Eleventh Circuit because petitioners resided in Florida or had their principal place of business in Florida when the petitions were filed, we deferred this opinion to consider the interpretation of Wisconsin law in Feldman, as well as cases involving transferee liability and "Midco" transactions decided since these cases were submitted.

In three separate notices of deficiency dated August 21, 2008, respondent determined that Terry K. Shockley (petitioner), Sandra K. Shockley (Sandra

[*3] Shockley), and Shockley Holdings Ltd. Partnership (Shockley Holdings) (collectively, petitioners) are liable as transferees for the Federal income tax liability, additions to tax, and an accuracy-related penalty of Shockley Communications Corp. (SCC) for its short tax year ended May 31, 2001. Respondent determined the value of the assets transferred to petitioners and the amounts of transferee liability of petitioners in proportion to SCC's outstanding liabilities, including interest as provided by law. Consequently, petitioners' transferee liabilities in dispute are as follows: (1) $10,975,059.03 for petitioner; (2) $11,244,084.42 for Sandra Shockley; and (3) $4,053,709.13 for Shockley Holdings.

The issues for decision on remand are whether petitioners are liable as transferees for their respective portions of the unpaid determined and assessed deficiency, additions to tax, penalty, and interest with respect to SCC's corporate income tax for its short tax year ended May 31, 2001; whether SCC is liable for the determined and assessed deficiency in tax, additions to tax, penalty, and interest for its short tax year ended May 31, 2001; and whether the Internal Revenue Service (IRS) adequately pursued collection efforts against SCC.

The parties have agreed that these cases may be decided on remand on the evidence submitted at the original trial. Unless otherwise indicated, all section

**[*4]** references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Facts with respect to these cases, some of which were stipulated, were found in Shockley I and are incorporated in our findings by this reference. We summarize for convenience relevant facts from Shockley I and set forth additional findings for purposes of deciding the issues on remand. Petitioner and Sandra Shockley (collectively, Shockleys) resided in Florida at the time they filed their petitions. Shockley Holdings is a limited partnership formed in 1998 under the laws of the State of Wisconsin, and its principal place of business was Florida at the time it filed its petition.

Petitioner received a master's degree in radio, television, and film from the University of Kansas. In the mid-1960s, petitioner started his career as the news and sports director of a small radio station. He later worked for a television station--first in sales, then in management, and finally as the president of the station. In 1985, petitioner left that position and formed SCC by purchasing a radio station in Madison, Wisconsin. Petitioner incorporated SCC, a closely held corporation, in March 1985 under the laws of the State of Wisconsin.

[*5]  Sandra Shockley, who holds a bachelor's degree, taught school for 11 years before joining her husband to start SCC in 1985.  She was initially a salesperson for SCC and later became the local sales manager and then the national sales manager.  In 1995 she was promoted to the head of the radio division.

Between 1985 and 2000, SCC grew to own five television stations, a radio station, and a video production company in Wisconsin, as well as a television station and several radio stations in Minnesota.  During this time, SCC brought in additional investors to fund the business expansion.  By May 31, 2001, SCC was owned by 29 shareholders including petitioners, other individuals, a number of investment funds, and the State of Wisconsin Investment Board (collectively, SCC shareholders).

Petitioner owned 10.18879% of SCC's common stock and served as president and treasurer of SCC and a member of the SCC board of directors (SCC board).  Sandra Shockley owned 10.18879% of SCC's common stock and served as vice president and secretary of SCC and a director on the SCC board.  Shockley Holdings owned 3.52508% of SCC's common stock.  Shockley Holdings is owned by the Shockleys, who are general partners, and their adult children, who are limited partners.

**[*6]**  In 1999 the Shockleys, approaching retirement age, started to consider their future as owners of SCC.  Around early 2000 they began exploring several strategic alternatives for SCC, including selling it.  On January 21, 2000, the Shockleys met with Stephen A. Schmidt, a managing director and tax partner of RSM McGladrey, Inc. (RSM).  RSM, an affiliate of SCC's accounting firm McGladrey & Pullen, is a professional services firm that offers accounting, tax, and other services to middle-market companies and provided SCC and its shareholders with tax and structuring advice.

During their meeting and through later communications, the Shockleys, other members of the SCC board, and RSM discussed six potential alternative futures for SCC:  (1) a sale of assets by SCC followed by its liquidation; (2) a sale of SCC stock; (3) tax-free reorganizations under section 368; (4) a "spin-off" of the SCC's radio station assets (radio assets) under section 355 followed by a sale of SCC stock; (5) redemption of SCC stock from the shareholders, and (6) a sale of SCC stock using an employee ownership plan.  RSM presented analyses, based upon certain assumptions, comparing the impact on a buyer who purchases stock or purchases assets, as well as a seller who sells stock or sells assets.  One stock sale analysis by RSM, which assumed a value of $190 million for the radio and television assets, showed net after-tax liquidation proceeds to shareholders of $94

[*7] million for a stock sale compared with the correlating asset sale proceeds of $75 million.

In February 2000, the Shockleys met with a media broker, Kalil & Co., Inc. (Kalil), also to discuss alternatives for SCC. They had engaged Kalil before, in 1996, to sell one of their radio stations. On April 5, 2000, petitioner signed an exclusive brokerage agreement with Kalil. After the brokerage agreement was in place, Kalil began seeking potential buyers for SCC.

During their communications, Schmidt introduced the Shockleys to Integrated Capital Associates (ICA), a firm that facilitated stock sales of companies. In April 2000, petitioners met Eric Sullivan, a principal of ICA, to learn about his company's services.

Over the next several months, the Shockleys continued to seek and receive advice from RSM and communicated regularly with Kalil regarding efforts to sell SCC. As to RSM, the SCC board reviewed the analysis that Schmidt prepared comparing a stock sale with an asset sale, which projected the stock sale producing a much greater return of net after-tax proceeds to shareholders. For that reason, the SCC board decided to pursue a stock sale. At some point, however, petitioner realized that the general preference of buyers in the broadcasting industry was an asset sale.

[*8]   While Kalil was able to find potential buyers interested in SCC's assets, the Shockleys discovered that it was unlikely that a broadcasting business would be interested in buying the stock of a company, like SCC, that had both television stations and radio stations.  Such a sale was unlikely because buyers showing interest in the small-market radio stations were not interested in the medium-sized-market television stations, and vice versa.  One potential buyer, Quincy Newspapers, Inc. (QNI), a media company in Quincy, Illinois, made an offer in May 2000.  Structured as an asset sale, the offer tendered a purchase price of $160 million for SCC's television stations and production company (television assets), which made up approximately 95% of SCC's total radio and television assets.

In a letter dated June 7, 2000, Kalil made petitioner aware of two companies that would potentially be willing to buy the stock of SCC and then sell its assets to third party buyers:  Fortrend International, LLC (Fortrend), and Diversified Group (Diversified).  As Kalil explained in the letter, this "buy stock/sell assets" transaction would have Fortrend or Diversified "'own' Shockley Communications for about one hour" with a negotiated fee for its services of somewhere between 5% and 7% of the gain.

On or about August 25, 2000, Schmidt organized a conference call wherein the Shockleys, among others, would speak with David Kelley, an employee and/or

[*9] partner at ICA. The agenda for the conference included an overview of ICA, the possible use of a "Midco" transaction for the stock sale of SCC, and a discussion of why ICA should be selected over Fortrend or Diversified. During the conference, the attendees, including the Shockleys, were informed that there was a risk that the IRS might recharacterize the transaction as an asset sale. However, ICA represented that none of the similarly structured transactions it had facilitated over an 18-year period had been successfully challenged or unwound.

If engaged to effect the sales of SCC's stock and assets, some of the principals and agents of ICA that would be involved in the process were Sullivan, ICA Chief Financial Officer Howard Teig, and Roger Ohlrich, an agent of ICA. In contemplation of doing business with ICA, petitioner made some calls to firms that had previously done business with ICA.

Throughout the summer of 2000, negotiations continued with QNI regarding the sale of SCC's television assets, but no agreement was reached. In September 2000, QNI indicated that it was willing to consider structuring the transaction as a purchase of the SCC stock instead of its assets and asked Kalil to provide SCC's asking price for the stock. In response, petitioner drafted a letter dated September 6, 2000, to QNI that (1) showed SCC's projected purchase prices for a stock sale and, alternatively, for an asset sale, (2) indicated that they could

[*10] proceed with a transaction structured either way, (3) provided an analysis comparing an asset purchase with a stock purchase, and (4) explained that the cash savings to SCC of a stock sale, rather than an asset sale, would be $11 million.  He continued explaining that

> [t]his [$11 million] represents the transaction cost quoted to us by an independent company ('Midco' is the generic term used for the firms which specialize in buying a company's stock, offsetting the taxable gains incurred, and reselling the assets to a third party). * * * Please note that we do have a 'Midco' company arrangement standing by to proceed--they would purchase SCC's stock and sell QNI the assets-- at the negotiated price shown.  In discussions with them and with our FCC Counsel, we have been assured that both the Midco purchase of SCC stock and the Midco sale of the TV assets to QNI can proceed simultaneously with the FCC and should not significantly delay a Closing.

QNI did not agree to the terms presented in that letter and never agreed to buy the stock of SCC but remained interested in the television assets.

In September 2000 the SCC board decided to sell SCC's stock to an affiliate of ICA.  Petitioner informed Kalil that the SCC shareholders intended to sell their stock.  Kalil, however, would continue to negotiate with QNI, on behalf of an ICA affiliate, regarding the price and terms of a potential sale of SCC's assets.

On October 6, 2000, QNI faxed a nonbinding letter of intent to ICA regarding the purchase of the television assets from the undisclosed client of ICA for $167 million.  That same day, ICA organized Northern Communications

[*11] Acquisition, LLC (NCA LLC), a Delaware limited liability company. On October 13, 2000, NCA LLC, as trustor and beneficiary, and Ohlrich, as trustee, executed a trust agreement forming Northern Communications Statutory Trust (NCS Trust) under the laws of Connecticut. According to the trust instrument, NCS Trust was established for the sole purpose of acquiring the stock of SCC.

Kalil maintained negotiations with QNI regarding the final price of the potential purchase. On October 27, 2000, QNI sent to Kalil a letter offering to purchase the television assets for $171 million along with a revised draft of the nonbinding letter of intent between QNI and ICA on behalf of the still-undisclosed client of ICA. On October 31, 2000, Kalil, on behalf of the seller, sent to QNI a letter accepting its offer to purchase the television assets.

On December 1, 2000, counsel for ICA incorporated Northern Communications Acquisition Corp. (NCAC), a Delaware corporation and a wholly owned subsidiary of NCS Trust. NCAC was created to serve as the entity that would purchase the SCC stock. Ohlrich became the president of NCAC, as well as the chairman and sole member of its board of directors.

Petitioner did not conduct any in-depth background investigation of NCS Trust or NCAC. However, during negotiations about the stock purchase, the SCC shareholders voiced concerns about the creditworthiness of NCAC. ICA

[*12] responded to these concerns by forming Northern Communications Fund, LLC (NC Fund), which was wholly owned by ICA-related entity Integrated Acquisitions Group, LLC (IAG). NC Fund and another entity, Slabfork LLC, then became the 85% and 15% owner-members, respectively, of the already established NCA LLC. In a letter dated December 28, 2000, to petitioner in his capacity as shareholder representative, IAG represented that, through NC Fund, NCA LLC, and NCS Trust, it would cause NCAC to be capitalized with either cash or technology interests.

Although the intent was for QNI to purchase all the television assets, Federal Communications Commission (FCC) regulations prohibited QNI from purchasing the Minnesota television station because of market conflict. QNI, however, still wanted an economic benefit from its relationship with the Minnesota television station, as well as an option to buy it later, if possible. To accommodate QNI, the Shockleys organized a company--TSTT, LLC (TSTT), a Wisconsin entity--that would purchase the Minnesota television station from NCAC. This measure would comply with FCC regulations yet still maintain QNI's interests as expressed through a joint services agreement. At some point prior to January 23, 2001, TSTT was renamed Shockley Broadcasting, LLC (SB LLC).

**[*13]** By the end of December 2000, NCAC entered into three agreements: (1) a stock purchase agreement (SPA) with the SCC shareholders dated December 28, 2000; (2) an asset purchase agreement with QNI (QNI APA) dated December 29, 2000; and (3) an asset purchase agreement with TSTT (TSTT APA) dated December 29, 2000. The SPA provided that the SCC shareholders would sell to NCAC all the SCC stock for a purchase price of $117 million, subject to certain adjustments. The QNI APA involved the sale of the Wisconsin television stations and production company by NCAC to QNI for $168 million, subject to certain adjustments, and the TSTT APA involved the sale of the Minnesota television station by NCAC to TSTT for $3 million.

On January 19, 2001, the IRS released Notice 2001-16, 2001-1 C.B. 730, clarified by Notice 2008-111, 2008-51 I.R.B. 1299, which described certain transactions as types of an "intermediary transactions tax shelter", identified those transactions as listed transactions, and took the position that direct or indirect participants of the same or substantially similar transactions would be required to disclose their participation in accordance with section 1.6011-4T(b)(2), Temporary Income Tax Regs., 65 Fed. Reg. 11207 (Mar. 2, 2000). After Notice 2001-16, supra, was issued, Schmidt sent copies of it to the Shockleys and their legal counsel because he believed that the proposed transaction with ICA had some

**[*14]** similarity with the transactions described in the notice. Petitioner understood Notice 2001-16, supra, to be an advisory notice.

In early 2001 Ohlrich toured the stations that SCC owned and was introduced to SCC employees as the president of the company that was purchasing SCC. In addition, NCS Trust applied for a loan of $175 million from Ultrecht-America Finance Co. (UAFC), a subsidiary of Coöperatieve Centrale Raiffeisen-Boerenleenbank, B.A. (Rabobank), in contemplation of purchasing the SCC stock.

On or around January 23, 2001, NCAC, SCC, QNI, and SB LLC filed applications with the FCC seeking consent for the SCC stock sale, transfer of the television stations, and assignment of broadcast station licenses as the parties' respective transactions required. In order to obtain the FCC consents, the parties of the transactions had to publish and broadcast notices of the applications to which the public could file comments, petitions to deny, or objections with respect to each application.

In a letter dated March 29, 2001, Midwest Communications, Inc. (Midwest), a Wisconsin corporation, made an offer to purchase the SCC radio assets from NCAC for $7.5 million. NCAC, through Ohlrich, accepted the offer on March 31, 2001.

[*15] On April 5, 2001, ICA's counsel incorporated Shockley Delaware Corp. (SDC), which was wholly owned by NCAC.  SDC was created, in part, to hold SCC's assets after the acquisition.  On or after April 27, 2001, ICA's agents formed Northern Communications Holdings Co. (NC Holdings), which had the same officer and director as NCAC, namely Ohlrich.  ICA had instructed that NC Holdings was to be created to serve as an intermediate company so that NC Holdings would wholly own NCAC while being wholly owned by NCS Trust.

In a business letter to petitioner, SCC, QNI, and Midwest dated April 16, 2001, Frank Kalil, the president of Kalil, referenced a discussion that he had had with petitioner regarding Kalil's fee schedule.  He wrote:  "Also, we discussed waiving * * * [Kalil's] fee on the midco expense of $9 million to which I have agreed.  In other words, our exclusive agreement fee schedule is applicable for $162 million on the television station sale and dollar-for-dollar on the radio station sale or a combined $178.5 million less $9 million equaling $169.5 million."  In a business letter drafted on May 1, 2001, to Kalil, petitioner referenced an attached exhibit A, which showed a "Stock Transaction Fee- ICA ($9,000,000)".  In a letter dated May 10, 2001, Robert A. Pasch, an attorney for SCC and the SCC shareholders, relayed to petitioner that "the fee calculation should not be attached

**[*16]** at all to the letter" and that "ICA strongly suggested that there be no documents / correspondence discussing the ICA fee".

On May 15, 2001, UAFC, which had financed other acquisitions by ICA, approved the loan request of NCS Trust, which would take the form of a promissory note up to $175 million made by NCS Trust in favor of Rabobank. Purportedly, the proceeds of the note would be used to fund NCAC's purchase of SCC's stock. Besides pledges to be made by NCS Trust, the note would at all times be fully secured by an amount in excess of the borrowed funds as provided by QNI and to be held in an escrow account (escrow I) or, alternatively, QNI would provide Rabobank with irrevocable payment instructions for cash held at First Union National Bank (First Union). Rabobank expected the loan to be repaid within two days of its being made from the proceeds of the QNI APA, and it expected to receive a transaction fee.

Midwest and NCAC entered into an asset purchase agreement on May 25, 2001 (Midwest APA), with respect to the SCC radio assets. NCAC, SCC, QNI, and SB LLC received the FCC consents for their various applications on May 30, 2001. Also on that date, UAFC, NCS Trust, NCAC, the SCC shareholders, and Rabobank entered into an agreement regarding a second escrow account (escrow II) with Rabobank serving as the escrow agent. According to the agreement,

[*17] NCAC, using NCS Trust's loan proceeds, would deposit an amount equal to the SPA purchase price into escrow II from which the SCC shareholders would subsequently be paid for their stock.

On May 31, 2001, the closings of the sale of SCC stock and the sales of SCC assets took place at one of the law firms representing ICA and NCS Trust. Ohlrich, as trustee of NCS Trust and with respect to its promissory note, instructed UAFC to draw down $130 million and to credit the funds to NCS Trust's Rabobank account. At the same time, Ohlrich authorized UAFC to debit from the same account Rabobank's transaction fee of $750,000. He transferred the remaining $129,250,000 of loan proceeds to NC Holdings in exchange for 100 shares of NC Holdings' preferred stock (preferred stock) given to NCS Trust, and then he pledged both NC Holdings' common and preferred stock (held by NCS Trust) to UAFC as additional security for repayment of the loan. However, NC Holdings then contributed the $129,250,000 loan proceeds to NCAC as a contribution to capital.

From that contribution, NCAC deposited $96,113,235.68 into escrow II. In accordance with the SPA and the escrow II agreement, the SCC shareholders, including petitioners, sold all their shares of SCC to NCAC. An amount of $94,713,235.68 from escrow II was then transferred to a third escrow account

[*18] created for the (now former) SCC shareholders from which disbursements would be made to them. SCC then became a wholly owned subsidiary of NCAC.

In exchange for their shares, petitioner initially received $8,478,007.29 (and also had an outstanding loan from SCC of $744,981.83 paid off on his behalf), Sandra Shockley initially received $8,747,032.68 (and also had an outstanding loan of $475,956.44 from SCC paid off on her behalf), and Shockley Holdings initially received $3,190,032.69. Petitioners also received a right to deferred payments from NCAC in exchange for their SCC stock. The Shockleys resigned from all of their positions in SCC as of that date.

Also on May 31, 2001, QNI, NCAC, UAFC, and First Union entered into an agreement with respect to escrow I. First Union served as the escrow agent, and QNI and some of its subsidiaries were the guarantors. In accordance with the escrow I agreement, QNI had caused to be deposited in escrow at least the sum required under the QNI APA for the purchase of the agreed-upon television assets. The agreement provided that all amounts paid from escrow I were to be applied to the satisfaction of QNI's obligation to pay the QNI APA purchase price and the obligation to repay the UAFC loan. The agreement also provided that UAFC would be repaid that day, absent any unusual circumstances.

**[*19]** Thereafter Ohlrich, now as president of both SDC and SCC, caused SCC to merge with and into SDC. Ohlrich then formed a new limited liability company under Delaware law named Shockley Communications Acquisition, LLC (SCA LLC). Effectively at the same time, Ohlrich authorized SDC to convert from a corporation to a limited liability company, and it thus converted into SCA LLC. Immediately following, SCA LLC admitted an additional member, Hare Street Trading, L.P., an Isle of Man limited partnership, which acquired a 1% membership interest. SCA LLC purchased the preferred stock subject to the UAFC loan obligation of NCS Trust. SCA LLC assumed this repayment obligation, whereupon UAFC released NCS Trust from its loan obligation. NCAC then merged into NC Holdings, and although NC Holdings was the surviving entity, its name was nonetheless changed to "Northern Communications Acquisition Corp." (NCAC II).

After that SCA LLC sold its newly acquired television assets to QNI and SB LLC in accordance with the QNI APA and the TSTT APA, respectively. A portion of the proceeds from these asset sales was disbursed to UAFC in repayment of the loan and thus fully discharged SCA LLC's obligation under the loan as of May 31, 2001. Ohlrich, as president of NCAC II, instructed Rabobank to transfer the remaining $33,136,764.32 of the NCAC contribution to capital/loan

[*20] proceeds to an account for SCA LLC.  All the above-described events that occurred on May 31, 2001, with regard to the SPA and QNI APA, took place within a span of under three hours.

Leading up to and throughout the closing, all parties, including petitioners, engaged experienced professionals and attorneys to handle complicated areas of the transactions including negotiations, FCC regulations, and taxation.  SCC and the SCC shareholders were represented in the sale of the SCC stock by three different law firms.  Per the requests of NCS Trust, NC Holdings, NCAC II, SCC, SDC, and SCA LLC, a law firm representing NCS Trust issued an opinion letter on May 31, 2001, regarding the events that transpired that day.  The opinion letter described the resulting tax consequences from the structure of the overall transaction of May 31, 2001, in part, as follows:

A.  It is more likely than not that:

1.  On conversion of NewShockley [i.e., SDC] into a limited liability company with Acquisition [i.e., NCAC] as its sole member, no gain or loss will be recognized by Acquisition under Code Section 322(a); no gain or loss will be recognized by NewShockley under Code Section 337(a); and Acquisition will take a tax basis in the assets of NewShockley equal to the basis of such assets in NewShockley's hands immediately prior to the conversation [sic] under Code Section 334(b).

2.  On the liquidation of Acquisition, no gain or loss will be recognized by Holdings [i.e., NC Holdings] under Code Section

**[*21]** 332(a); no gain or loss will be recognized by Acquisition under Code Section 337(a); and Holdings will take a tax basis in the assets of Acquisition equal to the basis of such assets in Acquisition's hands immediately prior to the liquidation under Code Section 334(b).

3.  Acquisition's tax basis in the stock of Shockley [i.e., SCC] acquired from Shockley Shareholders [i.e., SCC shareholders] will equal the amount of cash paid by Acquisition therefor.

4.  Until New Investor [i.e., Hare Street Trading, L.P.] acquires a 1% interest in New Shockley, immediately after conversion of NewShockley to a limited liability company, NewShockley will be disregarded for U.S. federal income tax purposes as an entity separate from Acquisition, its sole owner, with the result that the assets formerly owned by Shockley will be treated as owned by Acquisition.

5.  The contribution of the appreciated property by New Investor to NewShockley will be treated as a contribution by New Investor and by Acquisition, NewShockley's theretofore single member, to a newly formed partnership, and that such contributions will be governed by Code Section 721(a).

6.  Under Code Section 722, New Investor's tax basis in its interest in NewShockley will be equal to the basis of the contributed property in New Investor's hands immediately before the contribution and the tax basis of Acquisition in its interest in NewShockley will equal the tax basis of the assets of NewShockley immediately before the contribution by Acquisition.

7.  After its conversion to a limited liability company and acquisition of New Investor as a member thereof, NewShockley will be classified as a partnership for federal income tax purposes.

8.  Ninety-nine percent of the principal amount of the Loan [i.e., the UAFC loan] will be treated as a contribution of money by Acquisition to NewShockley under Code Section 752(a) and Treas. Reg. §1.752-3 and Acquisition's tax basis in its interest in NewShockley will be

[*22] increased by such amount under Code Section 722. Similarly, 1% of principal amount of the Loan will be treated as a contribution of money by New Investor to NewShockley under Code Section 752(a) and Treas. Reg. §1.752-3 and New Investor's tax basis in its interest in NewShockley will be increased by such amount under Code Section 722.

9. The merger of Acquisition into Holdings will cause a Code Section 708 termination of NewShockley to occur in connection with which, assuming NewShockley makes a timely and valid Code Section 754 election for its fiscal year ending in 2001, the $130,000,000 basis of the Preferred Shares [i.e., preferred stock] in the hands of NewShockley will be shifted to the basis of all assets then owned by NewShockley (other than the Preferred Shares) and the $130,000,000 of tax basis will be allocated among such assets in accordance with their respective fair market values.

NCAC II contracted with Shockley Group, Inc., an entity created by the Shockleys, to provide consulting services related to the ongoing operations of the radio stations. On September 21, 2001, NCAC II/SCA LLC sold the radio assets to Midwest in accordance with the Midwest APA.

After May 31, 2001, petitioners received the following distributions with regard to the sale of their stock:

| Date of distribution | Petitioner | Sandra Shockley | Shockley Holdings |
|---|---|---|---|
| July 24, 2001 | $297,596.00 | $297,596.00 | $102,932.00 |
| Sept. 10, 2001 | 212,201.39 | 212,201.39 | 73,395.88 |
| Sept. 25, 2001 | 678,537.29 | 678,537.29 | 234,691.39 |

| | | | |
|---|---|---|---|
| **[*23]** Oct. 30, 2001 | 12,081.41 | 12,081.41 | 4,178.70 |
| Dec. 21, 2001 | 40,755.17 | 40,755.17 | 14,096.33 |
| Jan. 25, 2002 | 10,174.73 | 10,174.73 | 3,519.22 |
| Dec. 20, 2002 | 14,773.75 | 14,773.75 | 5,109.92 |
| June 6, 2003 | 1,029,068.00 | 1,029,068.00 | 355,932.00 |
| Oct. 29, 2003 | 201,864.00 | 201,864.00 | 69,821.00 |

In exchange for their SCC shares, petitioner, Sandra Shockley, and Shockley Holdings ultimately received $10,975,059.03, $11,244,084.42, and $4,053,709.13, respectively.

Petitioners timely filed Federal income tax returns for calendar year 2001 reporting gains from the May 31, 2001, SCC stock sale. On or about February 24, 2002, the IRS received SCC's Form 1120, U.S. Corporation Income Tax Return, for its short tax year of January 1 through May 31, 2001. Prepared by Teig, the Form 1120 listed a Washington, D.C., mailing address for SCC and reported that SCC had zero assets by the end of its 2001 tax year and zero tax due. It also reported that on May 31, 2001, SCC had merged into SDC and that immediately thereafter SDC converted into a Delaware limited liability company resulting in SCC's liquidation and tax-free distribution under section 332.

[*24] On February 18, 2005, the IRS issued multiple notices of deficiency relating to SCC's short tax year ended May 31, 2001.  On May 25, 2005, the Shockleys filed a petition in response to the notice that was sent to them at their then home address in Wisconsin.  On April 26, 2007, that case at docket No. 9699-05 was dismissed for lack of jurisdiction because SCC lacked legal capacity to proceed in the case through the Shockleys.  On September 6, 2007, the IRS assessed the following amounts against SCC for the tax year ended May 31, 2001: (1) corporate income tax of $41,566,515; (2) an addition to tax under section 6651(a)(1) of $2,078,276; (3) an accuracy-related penalty under section 6662 of $8,313,303; and (4) interest of $26,953,309.60.  Thereafter, the IRS undertook transferee examinations of eight of the largest SCC shareholders who sold their SCC shares to NCAC on May 31, 2001, including petitioners.  The IRS sent to petitioners transferee notice of liability statements on August 21, 2008.

OPINION

Respondent's theory of these cases is that SCC was liable for Federal income tax related to its appreciated assets sold in 2001 and that petitioners are each liable for a portion of that unpaid tax because they received transfers from SCC.  To reach this outcome, respondent seeks to disregard the overall ICA transaction so that petitioners would be deemed to have received distributions

[*25] from SCC rather than having received consideration for their stock from NCAC.  Respondent also seeks to collect the tax from petitioners through the procedural provisions of section 6901.

Section 6901 addresses transferee liability and provides that the liability, at law or in equity, of a transferee of property of a taxpayer owing Federal income tax "shall * * * be assessed, paid, and collected in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the liabilities were incurred".  Sec. 6901(a).  Transferee liability under section 6901 includes related additions to tax, penalties, and interest owed by the transferor.  Kreps v. Commissioner, 42 T.C. 660, 670 (1964), aff'd, 351 F.2d 1 (2d Cir. 1965).  This Court has jurisdiction over transferee liability.  See secs. 6901(f), 6902(a) and (b); Rule 13(a).

Section 6901 does not independently impose tax liability upon a transferee but merely provides a procedure through which the IRS may collect unpaid taxes-- owed by a transferor of assets--from the transferee who received those assets.  Commissioner v. Stern, 357 U.S. 39, 42 (1958) (addressing section 311 of the Internal Revenue Code of 1939, the predecessor of today's section 6901).  Thus an independent basis for liability must be available, and this basis is generally found

[*26] under applicable State law or equity principles.  Sec. 6901(a)(1)(A);

Ginsberg v. Commissioner, 305 F.2d 664, 667 (2d Cir. 1962), aff'g 35 T.C. 1148

(1961).

Accordingly, three requirements must be met for the Commissioner to

assess transferee liability against a party under section 6901:  (1) the party must be

subject to liability under applicable State law or equity principles; (2) the party

must be a transferee under section 6901 pursuant to Federal tax law principles; and

(3) the transferor must be liable for the unpaid tax.  Swords Trust v.

Commissioner, 142 T.C. 317, 336 (2014); see Cullifer v. Commissioner, T.C.

Memo. 2014-208, at *42.  The Commissioner bears the burden of proving that a

party is liable as a transferee of the taxpayer's property but not of proving that the

taxpayer is liable for the tax.  See secs. 6902(a), 7454(c); Rule 142(d).

Respondent initially argues that the threshold question of whether

petitioners are transferees under section 6901 must precede and control any

analysis of State law liability.  Respondent insists that this analytical hierarchy

allows for petitioners to be first properly designated as transferees.  Only after this

designation is established, respondent asserts, should liability under State law be

addressed with petitioners already having been identified as transferees.

**[*27]** In response to this same argument made in other cases, this Court and the Courts of Appeals for the First, Second, Fourth, Seventh, and Ninth Circuits have all ruled that these two elements stand independent of each other and that any disregard of entities or transactions determined under the Federal transferee requirement would have to be determined separately under the State liability requirement.  See Feldman v. Commissioner, 779 F.3d at 458; Salus Mundi Found. v. Commissioner, 776 F.3d 1010, 1012 (9th Cir. 2014), rev'g and remanding T.C. Memo. 2012-61; Diebold Found., Inc. v. Commissioner, 736 F.3d 172, 185 (2d Cir. 2013), vacating and remanding Salus Mundi Found. v. Commissioner, T.C. Memo. 2012-61; Frank Sawyer Trust of May 1992 v. Commissioner, 712 F.3d 597, 605 (1st Cir. 2013), rev'g and remanding T.C. Memo. 2011-298; Starnes v. Commissioner, 680 F.3d 417, 429 (4th Cir. 2012), aff'g T.C. Memo. 2011-63; Swords Trust v. Commissioner, 142 T.C. at 338. Respondent presents no new argument that would cause a different outcome here. Thus, we first examine the State liability requirement independent of the Federal transferee requirement.

State Liability Requirement

As the transactions took place in Wisconsin, we use Wisconsin State law to determine whether petitioners are liable, as transferees, for the unpaid tax of SCC.

**[\*28]** See Commissioner v. Stern, 357 U.S. at 45. Wisconsin has adopted the Uniform Fraudulent Transfer Act, codified at chapter 242 of the Wisconsin Statutes. See Wis. Stat. secs. 242.01 to 242.11 (2000) (collectively, WIUFTA). WIUFTA defines "transfer" very broadly as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease and creation of a lien or other encumbrance." Id. sec. 242.01(12). Where a debtor transfers property to a transferee and thereby avoids creditor claims, WIUFTA provides creditors with certain remedies against the transferee. See id. sec. 242.07; see also id. sec. 242.01(3) (providing that "claim" means "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured"), (4) (defining "creditor" as a person who has a claim), (6) (defining "debtor" as a person who is liable on a claim). The Wisconsin Supreme Court has affirmed that WIUFTA reflects a strong desire to protect creditors. See Badger State Bank v. Taylor, 688 N.W.2d 439, 448 (Wis. 2004).

Under WIUFTA, creditors, such as respondent, have the burden to prove the elements of transferee liability by clear and convincing evidence. See Kaiser v. Wood Cnty. Nat'l Bank & Trust Co. (In re Loyal Cheese Co.), 969 F.2d 515, 518

**[*29]** (7th Cir. 1992); Mann v. Hanil Bank, 920 F. Supp. 944, 950 (E.D. Wis. 1996). Respondent argues that petitioners are liable under both sections 242.04(1)(a) and 242.05(1) of the Wisconsin Statutes. We first consider section 242.05(1) of the Wisconsin Statutes, which provides:

> (1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at the time or the debtor became insolvent as a result of the transfer or obligation.

Under this section, any transfer must be viewed exclusively from the perspective of the creditor--the degree of knowledge or beliefs or good faith of the putative transferees regarding the nature of the transfer are not relevant to analysis. See Badger State Bank, 688 N.W.2d at 449 ("The transferee's subjective state of mind does not play a role in resolving the present case under Wis. Stat. § 242.05(1)."). Thus, section 242.05(1) of the Wisconsin Statutes serves as a constructive fraud provision focusing on an objective result, meaning that there is no requirement that transferees be guilty of any fraud. Badger State Bank, 688 N.W.2d at 447.

For WIUFTA to apply at all, however, a transfer of some kind must have been made from SCC (the transferor) to petitioners (the transferees). Respondent

[*30] argues that although the Midco transaction was papered as a sale of SCC's stock, the actual substance of the transaction was an asset sale and liquidation of SCC. By relying on the judicial doctrine of "substance over form", respondent seeks to recast the transaction in this vein by disregarding the comprehensive Midco transaction. Once it is disregarded, respondent asserts, SCC would be deemed to have liquidated its highly appreciated assets and transferred the proceeds to its shareholders, including petitioners.

Petitioners argue that SCC transferred nothing to them and that respondent bears the burden of proving each element of section 242.05(1) of the Wisconsin Statutes without relying on "substance over form" or related theories to recast the transactions that occurred. They contend that "[t]here is no support in Wisconsin law for fabricating a transfer to Petitioners or treating Petitioners' sale of their SCC stock as anything other than a stock sale." They assert, correctly, that respondent cannot be placed in a better position than any other creditor under Wisconsin law. See Stern v. Commissioner, 357 U.S. at 47 ("The Government's substantive rights in this [transferee liability] case are precisely those which other creditors would have under * * * [State] law."). Ultimately, petitioners argue that they are not liable to creditors of SCC under Wisconsin law and, as a result, cannot be liable to respondent as transferees.

[*31] The Court of Appeals for the Seventh Circuit has recently addressed transferee liability under WIUFTA and specifically expressed that "state fraudulent-transfer law is itself flexible and looks to equitable principles like 'substance over form,' just like the federal tax doctrines". Feldman v. Commissioner, 779 F.3d at 459. The Court of Appeals instructed that "Wisconsin has long followed the general rule that '[e]quity looks to substance and not to form'" and noted that WIUFTA explicitly incorporates equitable principles under section 242.10 of the Wisconsin Statutes. Id. (quoting Cunneen v. Kalscheuer, 206 N.W. 917, 918 (Wis. 1926), which also declared that equity "is loath to lend itself to the accomplishment of a purpose different from that which the transaction usually imports."); see Wis. Stat. sec. 242.10 ("Unless displaced by this chapter, the principles of law and equity * * * supplement this chapter."). Although Wisconsin courts mostly apply the substance over form principle with little detailed analysis, it appears they use the doctrine in the same manner as Federal courts. See, e.g., Wis. Dep't of Revenue v. River City Refuse Removal, Inc., 712 N.W.2d 351, 363 n.19 (Wis. Ct. App. 2006) (noting that the substance over form principle governs the treatment of a taxpayer's activities and transactions for tax purposes while relying on Miller v. Tax Comm'n of Wisconsin, 217 N.W. 568, 569 (1928), which cites United States v. Phellis, 257 U.S. 156, 168 (1921), for the

**[\*32]** proposition that courts will look beyond the mere form to the substance of a transaction for the purpose of ascertaining its true nature), aff'd, 729 N.W.2d 396 (Wis. 2007).

The Court of Appeals also made clear that subjective intent and good faith play no role in the application of WIUFTA's constructive fraud provisions. Feldman v. Commissioner, 779 F.3d at 459. Thus, a transferee's reliance on her or his "due diligence and lack of knowledge of illegality is simply beside the point." Id. at 459-460. Guided by the Court of Appeals' interpretation of Wisconsin law, we look to the substance of the overall transaction.

Generally, courts respect the form of a transaction and will apply the substance over form doctrine only when warranted. John Hancock Life Ins. Co. (U.S.A.) v. Commissioner, 141 T.C. 1, 57 (2013). Taxpayers have the legal right to minimize or avoid their taxes by any means which the law permits. Gregory v. Helvering, 293 U.S. 465, 469 (1935); see Blueberry Land Co. v. Commissioner, 361 F.2d 93, 100 (5th Cir. 1966), aff'g 42 T.C. 1137 (1964).

This right, however, does not allow the taxpayer "to structure a paper entity to avoid tax when that entity * * * [has no] economic reality". Markosian v. Commissioner, 73 T.C. 1235, 1241 (1980). When the form of the transaction has not actually altered any cognizable economic relationships, the Court will look

[*33] through that form and apply the tax law according to the substance of the transaction.  See id.; see also Frank Lyon Co. v. United States, 435 U.S. 561, 573 (1978); Gregory v. Helvering, 293 U.S. at 469-470; Ocmulgee Fields, Inc. v. Commisssioner, 613 F.3d 1360, 1368-1369 (11th Cir. 2010), aff'g 132 T.C. 105 (2009); Crosby v. United States, 496 F.2d 1384, 1389 (5th Cir. 1974) ("'[I]t is the underlying essence of a transaction that determines its taxability.'" (quoting Int'l Trading Co. v. Commissioner, 275 F.2d 578, 583 (7th Cir. 1960), aff'g T.C. Memo. 1958-104)).  Ultimately, "substance prevails over form" and sham entities and transactions with no economic substance are disregarded for Federal tax law purposes.  Superior Trading, LLC v. Commissioner, 728 F.3d 676, 680-681 (7th Cir. 2013), aff'g 137 T.C. 70 (2011); accord Kirchman v. Commissioner, 862 F.2d 1486, 1492 (11th Cir. 1989), aff'g Glass v. Commissioner, 87 T.C. 1087 (1986).

Petitioners contend that the form of the transaction must be respected: NCAC, an unrelated party, purchased petitioners' stock in SCC, a solvent company with significant operating assets and no tax liabilities, by using cash proceeds obtained through a loan from a third-party financial institution.  At that point, NCAC allegedly became the sole shareholder of SCC for all purposes.  Thus, petitioners maintain that they received nothing from SCC and therefore cannot be transferees.

[*34] The Court of Appeals in <u>Diebold</u> summarized Midco transactions as follows:

> "Midco transactions" or "intermediary transactions" are structured to allow the parties to have it both ways: letting the seller engage in a stock sale and the buyer engage in an asset purchase. In such a transaction, the selling shareholders sell their C Corp stock to an intermediary entity (or "Midco") at a purchase price that does not discount for the built-in gain tax liability, as a stock sale to the ultimate purchaser would. The Midco then sells the assets of the C Corp to the buyer, who gets a purchase price basis in the assets. The Midco keeps the difference between the asset sale price and the stock purchase price as its fee. The Midco's willingness to allow both buyer and seller to avoid the tax consequences inherent in holding appreciated assets in a C Corp is based on a claimed tax-exempt status or supposed tax attributes, such as losses, that allow it to absorb the built-in gain tax liability. * * * If these tax attributes of the Midco prove to be artificial, then the tax liability created by the built-in gain on the sold assets still needs to be paid. In many instances, the Midco is a newly formed entity created for the sole purpose of facilitating such a transaction, without other income or assets and thus likely to be judgment-proof. The IRS must then seek payment from the other parties involved in the transaction in order to satisfy the tax liability the transaction was created to avoid.

<u>Diebold Found., Inc. v. Commissioner</u>, 736 F.3d at 175-176 (citing Notice 2001-16, <u>supra</u>).

At the time of the relevant events, petitioner and others referred to the overall transaction as a Midco. Independent of those references, we nonetheless determine that the transaction in issue substantially shares the Midco features described in <u>Diebold</u>.

[*35] While the Shockleys testified that neither they nor SCC ever hired ICA, the SCC board nevertheless made a decision in September 2000 to sell SCC's stock to an affiliate of ICA. No ICA "affiliate" existed to hire ICA at that time; thus the SCC board agreed, tacitly or otherwise, to permit ICA to act as an intermediary of a "buy SCC stock/sell SCC assets" transaction. The SCC board wanted ICA's services because the SCC shareholders could avoid the unwanted tax results of an appreciated asset sale and enjoy the sought-after tax savings of a stock sale--something it was unable to obtain before working with ICA. Over two months after the SCC board's decision, ICA created the stock purchaser, NCAC, which appears to have had no initial assets or any income-producing purpose of its own and was capitalized by ICA only when its lack of finances was questioned by the SCC board.

ICA also generated other shell entities: NCA LLC, NCS Trust, NC Holdings, SDC, and SCA LLC, as well as NC Fund to fund the unfunded NCAC. ICA then used this labyrinthine array to bring about a three-hour program of reorganizations, name changes, and restructurings, all for the ultimate result of a two-member LLC (one member being an Isle of Man entity) that was created for no other explained reason than to avoid the tax consequences of the sales of SCC's assets.

[*36] Although no witness was called upon to explain the detailed mechanics of the transaction, we can infer--on the basis of the opinion letter--that the anticipated tax-avoidance purpose of the overall (and abstruse) ICA transaction was chiefly as follows: Because NCAC wholly owned SCA LLC and thus became the sole member when SDC converted into SCA LLC, a result of no recognized gain by NCAC under section 332(a) or by SCA LLC under section 337(a) would occur. NCAC would then take a tax basis in the assets of SCA LLC equal to the basis of such assets in SDC's hands immediately prior to the conversion under section 334(b). In the instant between the SDC/SCA LLC conversion and the taking on of its new 1% member, SCA LLC would be disregarded for Federal income tax purposes as an entity separate from NCAC, its sole owner, with the result that the assets formerly owned by SCC would be treated as owned by NCAC. When Hare Street Trading, L.P., became its 1% member, SCA LLC could then be classified as a partnership for Federal income tax purposes. Jumping to section 752(a), 99% of the principal amount of the UAFC loan (now a partnership liability) would then be treated as a contribution of money by NCAC to SCA LLC, thus increasing NCAC's basis in its partnership interest under section 722. The merger of NCAC into NC Holdings would cause a section 708 termination of SCA LLC, and then the $129,250,000 basis of the preferred stock in the hands of SCA LLC would be

[*37] shifted to the basis of all of SCA LLC's other assets by making a section 754 election for its tax year 2001.  Similar to the SDC conversion, the liquidation of NCAC through its merger into NC Holdings would result in no gain having to be recognized by NC Holdings under section 332(a) or by NCAC under section 337(a).  NC Holdings would take a tax basis in the assets of NCAC equal to the basis in NCAC's hands immediately prior to the liquidation under section 334(b).  Although not stated in the legal opinion, it appears that NC Holdings' name was changed--even though it was the surviving entity of the merger--because of the remaining contracts requiring "Northern Communications Acquisition Corporation" as a party.

While the tax attributes of this scheme occurred during the overall transaction as opposed to having already been established before the transaction (such as a Midco's use of offsetting losses or tax-exempt status as described in the Diebold excerpt), we nonetheless conclude that these attributes serve the same sole purpose of tax avoidance.  The record reflects no other apparent reason for ICA to have created this many transactional entities and to have assumed this structuring other than the aspiration to reach an unwarranted tax result, i.e., SCC's appreciated assets having been sold without any correlating tax liability to SCC, SDC, SCA LLC, NCAC II, ICA, the SCC shareholders, or anyone else.

[*38] This manipulating of the Internal Revenue Code is a prime example of how a transaction can be structured so that its form might meet the letter of the law, but it nevertheless is being used in a manner incongruous with the intent of that law. See Commissioner v. Court Holding Co., 324 U.S. 331, 334 (1945) ("To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress."); Gregory v. Helvering, 293 U.S. 465, 470 (1935) (holding that where a transaction on its face lies outside the plain intent of a statute, the general premise--that taxpayers have the right to avoid their taxes by whatever means allowed by law--does not apply and that "[t]o hold otherwise would be to exalt artifice above reality and to deprive the statutory provision in question of all serious purpose").

With respect to third-party funding, ICA structured the overall transaction to have the sale of stock occur just before the sales of the assets (similar to the Midco transaction described in Diebold). This positioning made third-party funding through Rabobank and UAFC appear to be necessary. An added twist with this particular transaction was that the loan was actually necessary to accomplish an increase in NCAC's basis in its partnership interest that went towards the scheme's elimination of tax arising from the asset sales.

[*39] In form, NCAC used funds other than those from the sales of the SCC assets to purchase the SCC stock, thus further distancing the transaction from resembling a direct asset sale. In substance, however, there seems to be no true nontax reason for having taken this measure. The "form" ignores that Rabobank entered into the loan agreement because it would be fully secured by the pledged escrow I account that held funds deposited by QNI in excess of the loan (and because it would get a $750,000 fee). In effect the assets purchaser QNI guaranteed the stock loan at all times (regardless of whatever additional security Ohlrich pledged) so that petitioners could be paid in advance of the asset sales.

Petitioners also distanced themselves from having any connection with the only company of substance of all the ICA entities--ICA itself. The Shockleys testified that they did not hire ICA for any purpose, and petitioner testified that if anybody hired ICA it would have been "Northern". Yet none of the "Northern"-named entities had even been created before the day that ICA received the October 6, 2000, QNI letter of intent to buy the SCC assets. By having minimized their association with ICA, petitioners have excluded the only real party aside from the buyers that could have possibly made the transaction a bona fide multiple-party transaction.

**[\*40]** While there are some gaps in the record (e.g., whether ICA actually received a fee and in what amount), these unresolved areas can be explained by the clandestine measures the Midco transaction took (e.g., instructions not to leave a paper trail mentioning ICA's fee). These gaps do not deny us the ability to draw reasonable inferences from the available evidence, such as ICA's having received a fee for its services from the approximately $60 million difference between the proceeds of the asset sales (according to the QNI APA and the TSTT APA), and the cost of the stock (according to the SPA). See Owens v. Commissioner, 64 T.C. 1, 15 (1975), aff'd in part, rev'd in part on other grounds, 568 F.2d 1233 (6th Cir. 1977).

Thus, looking to the objective economic realities of the transaction, the evidence and reasonable inferences therefrom sufficiently establish that the true substance of the transaction is different from its form--that the only purpose of the ICA Midco transaction was tax avoidance. See Frank Lyon Co., 435 U.S. at 573; Harris v. Commissioner, 61 T.C. 770, 783 (1974). This conclusion is reached regardless of whether petitioners entered into the transaction in good faith, whether they had no knowledge of ICA's overall scheme, or whether they did not know that SCC would have an unpaid tax liability. See Feldman v. Commissioner, 779 F.3d at 459-460. The Midco transaction is therefore disregarded. As a result,

[*41] petitioners are deemed not to have received consideration for their stock from NCAC but, instead, to have received distributions from SCC pursuant to its de facto liquidation. See Feldman v. Commissioner, T.C. Memo. 2011-297, slip op. at 35.

Petitioners counter this conclusion by arguing that the form of the overall transaction should be respected pursuant to the economic substance doctrine. They assert that their sale of SCC stock to NCAC had substantive economic effects on the parties and legitimate business purposes.

Wisconsin courts have mentioned the economic substance of transactions but without having expressed analysis in any detail. See, e.g., Sullivan Bros. v. Wis. Dep't of Revenue, No. 2013AP818, 2014 WL 321867 (Wis. Ct. App. Jan. 30, 2014) (reviewing the judgment of a circuit court that had affirmed a decision of the Wisconsin Tax Appeals Commission, which had determined that the taxpayer's transactions lacked economic substance). The Court of Appeals for the Eleventh Circuit has conveyed that the "economic-substance doctrine, also called the sham-transaction doctrine, provides that a transaction ceases to merit tax respect when it has no 'economic effects other than the creation of tax benefits.' * * * Even if the transaction has economic effects, it must be disregarded if it has no business purpose and its motive is tax avoidance." United Parcel Serv. of Am.,

[*42] Inc. v. Commissioner, 254 F.3d 1014, 1018 (11th Cir. 2001) (citation omitted) (quoting Kirchman v. Commissioner, 862 F.2d at 1492), rev'g T.C. Memo. 1999-268. Accordingly, a flexible analysis--focusing on the two factors of economic substance and business purpose--may be used to determine whether a transaction (or series of related transactions) constitutes a substantive sham. Winn-Dixie Stores, Inc. v. Commissioner, 113 T.C. 254, 279-280 (1999), aff'd, 254 F.3d 1313 (11th Cir. 2001). Economic substance is thus determined by an "objective evaluation of changes in economic position of the taxpayer (economic effects) aside from tax benefits", and by a subjective analysis of the taxpayer's intent as to whether there was a legitimate business purpose for entering in the transaction. Id. at 280.

An objective evaluation of economic substance depends on whether "the transaction was likely to produce economic benefits aside from tax deductions" to the taxpayer. Id. at 280, 285; see Kirchman v. Commissioner, 862 F.2d at 1492. The kind of "economic effects" that entitles a transaction to be regarded for tax purposes includes the creation of genuine obligations enforceable by an unrelated party. United Parcel Serv. of Am., Inc. v. Commissioner, 254 F.3d at 1018 (citing Frank Lyon Co., 435 U.S. at 582-583).

**[*43]** Petitioners pose several arguments that the sale of their SCC stock created genuine obligations, thus real economic effects, with regard to themselves and the ICA entities. As some examples, they point to the shifting of ownership rights between the SCC shareholders and NCAC, as well as SCA LLC's having owned the radio stations for four months and its inherent responsibility for any violation of FCC rules during that time. The economic substance doctrine, however, does not look at the economic effects of the transaction on its parties or on the putative transferees--but on the taxpayer. The taxpayer here is SCC, not petitioners; and while its economic position definitely changed because of the transaction (having had its assets of approximately $178 million reduced to zero in scant hours), the record shows no nontax economic benefits having been received by SCC.

Considering the Midco transaction as a whole, we conclude that its only function was to produce tax effects that eliminated SCC's income tax liabilities. Without the tax-avoidance aspects, the plan provided no benefit to SCC and, therefore, lacked economic substance apart from its tax objective.

The economic substance doctrine also takes into consideration whether the taxpayer had a legitimate, non-tax-avoidance business purpose in entering into the transaction. Kirchman v. Commissioner, 862 F.2d at 1492-1493 (applying the sham transaction doctrine). But compare id. at 1492 ("It is clear that transactions

[*44] whose sole function is to produce tax deductions are substantive shams, regardless of the motive of the taxpayer.") and United Parcel Serv. of Am., Inc. v. Commissioner, 254 F.3d at 1018 n.2 ("Kirchman, which is binding in this circuit, * * * explicitly refuses to examine subjective intent if the transaction lacks economic effects."), with United Parcel Serv. of Am., Inc. v. Commissioner, 254 F.3d at 1018 (citing Karr v. Commissioner, 924 F.2d 1018, 1023 (11th Cir. 1991) for "noting that subjective intent is not irrelevant, despite Kirchman's statement of the doctrine").  In Winn-Dixie, the Court addressed the business purposes of a taxpayer after having determined that the transactions in issue lacked economic substance apart from tax considerations.  See Winn-Dixie Stores, Inc. v. Commissioner, 113 T.C. at 285.  In the Winn-Dixie appeal, the Court of Appeals for the Eleventh Circuit affirmed without comment as to the Court's inclusion of a business purpose analysis.  See generally Winn-Dixie Stores, Inc. v. Commissioner, 254 F.3d 1313.  On the side of caution, we follow Winn Dixie and review the business purpose factor even though we have determined that the transaction had no economic substance.

The inquiry into whether there was a legitimate business purpose involves a subjective analysis of the taxpayer's intent.  See Winn-Dixie Stores, Inc. v. Commissioner, 113 T.C. at 280.  A transaction entered into by a "going concern"

**[*45]** has a business purpose "as long as it figures in a bona fide, profit-seeking business." United Parcel Serv. of Am., Inc. v. Commissioner, 254 F.3d at 1019.

Petitioners assert a few nontax business purposes for their having participated in the transaction, such as maximizing the return on their investment in SCC before retiring, avoiding the emotional difficulty involved in breaking up the company over time instead of all at once, and allegedly lacking any choice in the matter because the SCC board decided to pursue the stock sale. Again, petitioners' purposes are immaterial because we are looking to the business purposes of the taxpayer. As the taxpayer is SCC, the business purposes of the SCC board are determinative.

Petitioners ascribe only one potential business purpose to the SCC board's decision to enter into the transaction: its wanting to pursue a stock sale because of the greater return on investment to shareholders than that from an asset sale. The reason for the greater net after-tax proceeds from a stock sale, however, was essentially the avoided tax on the built-in gains of SCC's appreciated assets. Thus, this business purpose is directly related to the tax-avoidance objective.

Though not attributed to the SCC board, a possible business purpose could have been the effect on employee morale from the piecemeal selling of SCC to several different buyers over time. Petitioners describe a legitimate business

[*46] concern of the impact on employee retention and possible decrease in productivity under these circumstances.

If the SCC board was concerned about the "breaking up" of SCC, however, it nevertheless submitted to the overall transaction with the knowledge that this exact result would occur. At a minimum the SCC board, in whole or in part, knew that ICA would split up the television assets, as the Shockleys (through TSTT/SB LLC) were one of the buyers; and it knew that the radio assets would not be sold at the same time as the television assets (and subsequently knew that the radio assets would sell four months after the sales of the television assets). While a business purpose may still be valid even if its desired result does not come to pass, in this instance the SCC board was not shown to have held this proposed purpose or to have made any attempt to achieve it.

In addition, the overall transaction nullified SCC as a "going concern" by having it merged out of existence. Consequently, SCC, through the SCC board, had no genuine business purpose with regard to the Midco transaction other than Federal income tax savings.

Petitioners also raise arguments under more substance-over-form-related doctrines, namely the conduit theory and the step transaction doctrine. Having already concluded that the transaction was a sham under a substance over form

[*47] analysis as supported by an economic substance analysis, we need not consider these additional doctrines.

We conclude that the overall Midco transaction was a sham because it was not a true multiple-party transaction, lacked economic substance, had no business purpose, and was only entered to avoid tax. Cf. Frank Lyon Co., 435 U.S. at 583-584 (determining that where there is a "genuine multiple-party transaction with economic substance", compelled by business realities, imbued with tax-independent considerations, and not shaped solely by tax-avoidance features with meaningless labels, the Government should honor the intent of the parties). In keeping with the substance of the transaction, SCC is therefore deemed to have sold all its assets, incurred the inherent taxable capital gains, liquidated, and distributed parts of the proceeds from its asset sales to petitioners. In the light of WIUFTA's broad definition of "transfer", transfers are deemed to have been made from SCC to petitioners. See Wis. Stat. secs. 242.01(12), 242.06; Feldman v. Commissioner, 779 F.3d at 458-459.

Having established that transfers are deemed to have occurred, we now consider whether petitioners are liable under section 242.05(1) of the Wisconsin Statutes. A creditor pursuing a claim under section 242.05(1) of the Wisconsin Statutes must satisfy three requirements: "(1) the creditor's claim arose before the

[*48] transfer was made; (2) the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer; and (3) the debtor either was insolvent at the time of the transfer or became insolvent as a result of the transfer." Badger State Bank, 688 N.W.2d at 442.

With respect to the first requirement, petitioners argue that respondent did not have a claim at the time they received the funds for their SCC stock. Their position is based upon the overall Midco transaction having been engineered to have the stock sale occur an hour or two ahead of the television asset sales.

Because of the disregarded sham transaction, however, SCC is deemed to have sold its television assets and radio assets--taxable events that fall within the definition of a claim under WIUFTA. See Wis. Stat. sec. 242.01(3); see also Stuart v. Commissioner, 144 T.C. ___, ___ (slip op. at 2) (Apr. 1, 2015), amended per order, (Apr. 15, 2015) (holding that unmatured tax liabilities are "claims" within the meaning of that term as defined in the Uniform Fraudulent Transfer Act); Feldman v. Commissioner, T.C. Memo. 2011-297, slip op. at 36 ("Income tax liabilities arising from the sale of corporate assets are 'claims' existing at the time of the sale."). Logically, these deemed sales would have had to occur before SCC's being theoretically able to distribute/transfer the resulting proceeds to petitioners. Cf. Cullifer v. Commissioner, at *41 (citing Notice 2008-111, supra,

**[*49]** sec. 2, for the premise that the tax mechanics of a Midco transaction remain the same regardless of the order in which the stock sale and the asset sale occur).

Petitioners also argue that any Federal tax liability that arose from those sales could not have accrued until February 15, 2002, the due date of SCC's Federal tax return. Petitioners cite Locke v. Commissioner, T.C. Memo. 1996-541, aff'd without published opinion, 152 F.3d 927 (9th Cir. 1998), as authority. The Court in Locke did declare that the tax liability of the transferor accrued on the due date of the return (thus--in the timeframe of that case--before the transfer). This declaration, however, was reflecting the Commissioner's argument for that particular determination in that particular case; it was not a universal pronouncement. The transferee had conversely argued that the claim arose after the transfer (thus after the return due date) because no definitive partnership-related liability had been determined at the time of the transfer because the post-1984 caselaw that provided the groundwork for such liability had not yet been determined. Nevertheless--specifically to that case--the Court determined that the tax liability for that transferor accrued on the due date of the return as opposed to afterwards. Moreover, as authority for reaching that determination, the Court cited Swinks v. Commissioner, 51 T.C. 13, 17 (1968), which held that "[a] transferee is liable retroactively for the transferor's taxes and

[*50] additions to the tax in the year of the transfer to the extent of assets received from the transferor, even though the tax liability of the transferor was unknown at the time of the transfer." Accordingly, respondent's claims are deemed to have arisen before the transfers were made.

Regarding the second requirement that the transferor did not receive a reasonably equivalent value in exchange for the transfer, petitioners argue that they did not receive a transfer from SCC. They also argue that the amount they did receive from NCAC for their SCC stock was the true value purchase price.

Whether reasonably equivalent value was received by the transferor is a question of fact. See Edinger v. Hazelquist, 724 N.W.2d 703, No. 2005AP2955, 2006 WL 2864522, at *2 (Wis. Ct. App. Oct. 10, 2006); see also Feldman v. Commissioner, T.C. Memo. 2011-297, slip op. at 38. While it does not define "reasonably equivalent", WIUFTA provides that "[v]alue is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied". Wis. Stat. sec. 242.03(1).

The record reflects that petitioners received distributions of approximately $26 million (not including loan repayments) from the proceeds of the sales of SCC's assets while SCC received nothing (or, at best, received petitioners' shares of SCC stock, which--because of the distributions essentially liquidating SCC--

[*51] were worthless). Thus, the deemed transferor SCC did not receive value, reasonably equivalent or otherwise, in exchange for the proceeds from the sale of its assets.

As to the third requirement, whether the debtor became insolvent as a result of the transfer, petitioners contend that at the time that the SCC shareholders had sold their stock to NCAC, SCC had assets well in excess of its liabilities. Petitioners also contend that SCC could not have incurred a tax liability following its merger with SDC and conversion into SCA LLC.

A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation. Id. sec. 242.02(2). As discussed, the tax on the sales of the assets was a debt to SCC as of the date of sale, May 31, 2001. That tax debt would have been approximately $39,488,189. (We arrive at this amount by attributing 95% of the deficiency of $41,566,515 to the television assets that accounted for approximately 95% of SCC's total assets. While $39,488,189 may not be the actual amount of tax owed on the sales of the televison assets, it is close enough to illustrate SCC's economic status.) For our purposes, the approximate fair market value of SCC's remaining assets after the May 31, 2001, sales, i.e., the radio assets, is considered to be their purchase price of $7.5 million. As a result, SCC's tax debt was significantly greater than its

[*52] remaining assets as of May 31, 2001. When SCC sold its remaining assets in September 2001, it would have continued to be insolvent pursuant to section 242.02(2) of the Wisconsin Statutes.

In summary, we conclude that petitioners are transferees under section 242.05(1) of the Wisconsin Statutes because SCC made transfers to petitioners and others without having received anything of value in exchange, those transfers caused SCC to become insolvent, and respondent's claims arose before the transfers were made. Because we conclude that petitioners, as transferees, are liable for SCC's 2001 tax liability under section 242.05(1) of the Wisconsin Statutes, we need not consider section 242.04(1)(a) of the Wisconsin Statutes.

Federal Transferee Requirement

For purposes of section 6901, the term "transferee" includes, inter alia, donee, heir, legatee, devisee, distributee, and shareholder of a dissolved corporation. See sec. 6901(h); sec. 301.6901-1(b), Proced. & Admin. Regs. The principle of substance over form applies to determinations of transferee liability issues. See generally Scott v. Commissioner, T.C. Memo. 1998-426, aff'd, 236 F.3d 1239 (10th Cir. 2001). In accordance with the substance over form analysis applied supra, petitioners, as distributees of SCC, are determined to be transferees pursuant to section 6901.

**[*53]** Transferor Liability for Unpaid Tax

In arguing whether SCC actually owed the tax liability for its short tax year ended May 31, 2001, petitioners rely on the Midco transaction not being disregarded. They maintain that it was not SCC but SCA LLC that sold the assets and, therefore, the members of SCA LLC were required to report the gain from the asset sales and pay the resulting tax.

Petitioners bear the burden of proof on this matter and offer no alternative arguments as to SCC's tax liability. See sec. 6902(a); Rule 142(d). Petitioners point to nothing in the record that shows that respondent incorrectly determined or improperly assessed SCC's tax liability for 2001. As the Midco transaction was determined to be a sham and all of the ICA-created entities are disregarded, we conclude that SCC was liable for the unpaid tax for its short tax year ended May 31, 2001.

Collection Efforts Against SCC

Petitioners allege that respondent cannot impose transferee liability on them because respondent failed to prove that the IRS was unable to collect from SCC. They argue that respondent failed to show that the IRS exhausted all efforts to collect from SCC before proceeding against them. They also claim that SCA LLC

[*54] was directly liable for any of SCC's debts pursuant to Wisconsin law and that respondent did not pursue collection from SCA LLC.

State law determines whether respondent had an obligation to pursue collection efforts against SCC before proceeding against petitioners. See Hagaman v. Commissioner, 100 T.C. 180, 183-184 (1993) ("[E]ven with regard to transferee liability in equity, certain of the elements described in * * * [Gumm v. Commissioner, 93 T.C. 475, 480 (1989), aff'd without published opinion, 933 F.2d 1014 (9th Cir. 1991), including the element that all reasonable efforts to collect from the transferor were made and that further collection efforts would be futile,] frequently are unnecessary under State law."); Kardash v. Commissioner, T.C. Memo. 2015-51, at *22-*24. WIUFTA does not require a creditor to pursue all reasonable collection efforts against the transferor. See Wis. Stat. secs. 242.01 to 242.11. Accordingly, respondent was not required to exhaust collection efforts against SCC. As to SCA LLC, it is a disregarded entity.

In reaching our decisions, we have considered all arguments made, and, to the extent not mentioned, we conclude that they are moot, irrelevant, or without merit.

**[*55]** To reflect the foregoing,

<u>Decisions will be entered</u>

<u>for respondent</u>.